(No. 12730.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* PRUDENCIO LAURES, Plaintiff in Error.

*Opinion filed October 27, 1919.*

1. CRIMINAL LAW—*when judgment of conviction will not be reversed on evidence.* It is only where the court is able to say, from a careful consideration of the whole of the testimony, that there is a well founded doubt of the guilt of the accused, that the Supreme Court will interfere on the ground that the evidence does not support the verdict.

2. SAME—*when case will not be reversed because of inexperience of counsel for defendant.* Where the defendant is unable to employ his own counsel and the court appoints two attorneys for the defense while the State's attorney is unassisted in the prosecution, a judgment of conviction will not be reversed because of the inexperience of the counsel for the defense, where there was ample time to prepare for the trial and there is nothing in the record with reference to the experience of counsel for the defense in criminal trials. (*People* v. *Blevins,* 251 Ill. 381, distinguished.)

3. SAME—*what evidence is proper to show motive in homicide.* Evidence of jealousy and unrequited love, and the facts on which it rests, is relevant for the purpose of showing motive in homicide.

4. SAME—*when evidence as to meaning of foreign words used by defendant is proper.* Where there is a dispute in a murder trial over the proper translation by the interpreter of foreign words used

by the defendant in making a threat or in talking about the deceased, the court may permit other testimony with reference to the meaning of the words by witnesses who are familiar with the language used, so as to obtain a proper interpretation. (*Schnier* v. *People,* 23 Ill. 11, followed.)

5. SAME—*when evidence of another distinct offense is competent.* The test of relevancy is the connection of the facts proved with the offense charged, and whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another offense.

6. SAME—*one instruction may refer to another.* Instructions should be considered as a series, and it is not improper to refer in one instruction to another.

7. SAME—*instruction quoting sections 148 and 149 of Criminal Code correctly states law of self-defense.* An instruction quoting sections 148 and 149 of the Criminal Code, fairly connected, correctly states the law of self-defense and is not misleading.

8. SAME—*when new trial will not be granted for newly discovered evidence.* The granting of a motion for a new trial on newly discovered evidence rests largely in the discretion of the trial court, and the motion will not be granted for the purpose of admitting inconclusive, cumulative or impeaching testimony, especially where there has been a lack of proper diligence to procure the evidence on the trial.

WRIT OF ERROR to the Circuit Court of Bureau county; the Hon. JOE A. DAVIS, Judge, presiding.

WALTER A. PANNECK, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, JOSEF T. SKINNER, State's Attorney, and FLOYD E. BRITTON, (J. L. SPAULDING, of counsel,) for the People.

Mr. JUSTICE CARTER delivered the opinion of the court:

About one o'clock on Christmas morning, December 25, 1918, plaintiff in error, Prudencio Laures, shot and killed Celestino Blanco in the home of Celedonio Menendez, at DePue, in Bureau county, Illinois. He was tried in the circuit court of that county, the jury finding him guilty of murder. After the motion for a new trial and in arrest of

judgment was overruled he was sentenced to be hanged on
April 11, 1919. The writ of error was thereafter made a
*supersedeas* by one of the judges of this court in vacation,
and the case is now here for review.

The evidence shows that the deceased, Blanco, and plain-
tiff in error, were acquainted in Spain; that plaintiff in
error was the first of the two to come and live at the vil-
lage of DePue and that some time thereafter Blanco came
to the same place; that both men were employed at the
zinc works located there, plaintiff in error living in the
eastern part of the village, in what is known as the White
City, while the deceased lived about a mile westerly from
plaintiff in error. The evidence tends to show that in March
or April, 1918, there arrived in the village Josephine Al-
virez, coming from Cuba; that plaintiff in error had sent
money to apply on her transportation from Cuba to this
country and she came to DePue under the impression that
she was to marry him; that they lived together about two
months in White City; that then they separated and she
went to the western part of DePue, where she started a
boarding house and had among her boarders for a time the
deceased; that he lived at her boarding house until some
time in September, 1918; that during the time Josephine
Alvirez kept the boarding house plaintiff in error visited her
at various times and some conversation was had between
them with reference to her quitting the boarding house and
leaving the village, but she refused to leave DePue. The
evidence also tends to show that plaintiff in error claimed
that he left a wife in Spain because she was going with
certain men and that the deceased was one of these men;
that he said to several people during the time Josephine
Alvirez was living in DePue that unless the deceased kept
away from her there would be trouble, or words to that
effect; that he made this statement as late as two weeks
before the shooting, although there is no evidence in the
record showing definitely that the deceased had anything

to do with the Alvirez woman after he left her boarding house in September before the shooting. There is no evidence indicating that during the time that both men lived in the village, up to the night of the shooting, there had been open trouble of any kind between them. The building in which the shooting occurred is a two-story frame structure, facing north, on the south side of Marquette street, which there runs east and west. There was an ordinary entrance near the center of the front of the building, which led to a short hallway, upon the west side of which, about two feet south of the front entrance, was a door that led into a kitchen. The kitchen faced Marquette street. South of and immediately back of it was the dining room, and east of the dining room was what is known as the coal room. The only entrance to the dining room from the front part of the building was a door at the northwest corner of the dining room and the southwest corner of the kitchen. The dining room contained a heating stove standing in the northeast corner, a table about three feet in width, back of the table a bench five feet in length which was used by the boarders to sit on for their meals at the table, and there were four or five chairs in the room that night on three sides of the table, the bench being between the table and the west wall of the dining room. The coal room to the east of the dining room does not appear to have been used for any purpose in the winter except to store coal, having an entrance into it from the porch at the rear of the building and also from near the southeast corner of the dining room.

The testimony shows that there is a custom among the Spanish people on Christmas eve to congregate at some home to celebrate the coming of Christmas; that on Christmas eve, December 24, 1918, Celestino (called Celo) Menendez, the occupant of the building described herein, had such a gathering at his home, to which he invited some of his Spanish friends, including plaintiff in error, but did not

invite deceased. Plaintiff in error reached the house about 8:30 in the evening. The deceased and two friends, Rodriquez and Gonzales, arrived at the house about ten o'clock and were admitted by the wife of Menendez. They went through the kitchen into the dining room. Plaintiff in error was then in the dining room. The evidence tends to show that deceased sat down by him on the bench and that after their arrival all present took a bottle of beer apiece; that they drank beer, ate cake, played cards and told stories and were all enjoying themselves, each according to his own fashion; that plaintiff in error and deceased joined in the telling of stories, although they did not speak to each other; that they were all there together until between twelve and one o'clock; that during that time plaintiff in error left the dining room, going out to a porch at the rear of the house through the coal room; that when he came back deceased was occupying the seat that he had left, so he took a seat across the table; that many of the men wore their overcoats while in the room, although some of them removed their hats; that not long after twelve o'clock the deceased suggested that he and his two companions go home. Plaintiff in error testified that about that time he left the dining room and entered the kitchen, starting for home, and was walking towards the door leading to the hallway; that as he got near the door deceased came up to him and said, "I will kill you," and took hold of him by the clothing and started to push him toward the dining room, and as plaintiff in error was trying to turn around the deceased attempted to throw him on the ground and choke him, saying, "You son of a bitch! I will kill you!" that during this struggle he shot several times at the deceased; that they continued struggling through the door into the dining room, and overturned the stove there; that deceased threw him to the floor in the dining room.

The testimony agrees that deceased was shot at least twice, one of the wounds being fatal and the other being a

flesh wound. There is some testimony that he was shot three times, the third wound being a mere flesh wound, and there is also some testimony tending to show that there were four shots fired. We think the weight of the testimony tends to show that the fatal shot was fired in the kitchen and not after the parties reached the dining room. After the stove was overturned the proprietor, Menendez, interfered and separated the two men while they were struggling. Plaintiff in error left at once and went home. The deceased was helped to his feet and placed on a bed but lived less than hour. Only two of the witnesses claimed to have seen any of the struggle that took place in the kitchen. These were Rodriquez and Gonzales, who came with deceased to the place, and it is quite clear from their testimony that they did not see the beginning of the struggle and were unable to tell definitely all that took place during the struggle in the kitchen. It is not claimed, and there is no testimony, that the deceased was armed in any way, with a pistol or otherwise. Three bullet holes were found in the walls of the kitchen, and it is apparent from these, assuming, as we must, that the shots were all fired by plaintiff in error, that during the struggle in the kitchen the two men changed sides. The weight of the testimony is to the effect that the shooting occurred very shortly after deceased entered the kitchen, some of the testimony being to the effect that it was two or three minutes after plaintiff in error entered the kitchen. We think it is manifest from reading the testimony of all these witnesses that none of them were absolutely certain as to just how long it was after either the deceased or plaintiff in error left the dining room before the shooting took place. It is evident that it was a very brief period.

We find considerable discussion in the briefs as to the size of the rooms and the different articles in the kitchen and dining room, but we do not think the size of these rooms and articles had any material bearing on the issues,

except in so far as the location and size of the doorways might have some bearing on the testimony of Gonzales and Rodriquez as to what they saw of the struggle in the kitchen.

The theory of the State on the trial was, and now is, that plaintiff in error went to the kitchen first to lie in wait, as it were, for Blanco when he came through and that the assault he made upon deceased was premeditated. The theory of counsel for plaintiff in error on the trial was, and the theory of his present counsel now is, that the deceased was the aggressor in the beginning of the trouble and continued the aggressor during the whole struggle until he received his fatal wound; that plaintiff in error was justified in shooting in self-defense.

Counsel for plaintiff in error argues earnestly and at length that the evidence in the record does not justify the conviction, and that the case should be reversed for that cause if for no other. Taking into consideration that part of the evidence which is conceded to have been properly introduced, we can reach no other conclusion than that the question whether the homicide was committed as an act of self-defense by plaintiff in error or whether the act was premeditated and justified the verdict is peculiarly a question for the jury. This court is reluctant to substitute its opinion for that of the jury upon controverted questions of fact. It is only where the court is able to say, from a careful consideration of the whole of the testimony, that there is clearly a reasonable and well founded doubt of the guilt of the accused, that it will interfere on the ground that the evidence does not support the verdict. (*Gainey* v. *People,* 97 Ill. 270; *People* v. *Grosenheider,* 266 id. 324.) We cannot say from an examination of this record that the verdict in the case at bar is manifestly erroneous or that the finding of the jury is obviously contrary to the decided weight of the testimony. Unless there is some material error of law in the record, therefore, which would injuri-

ously affect the issues against plaintiff in error, we would not feel justified in interfering with the verdict.

Counsel for plaintiff in error is not the same counsel who appeared for him in the trial of the case in the circuit court. It is most strenuously argued by the present counsel that counsel who appeared for plaintiff in error in the trial court were so inexperienced in the trial of criminal cases that plaintiff in error on that account did not receive a fair trial. It appears from the record that plaintiff in error was unable to employ or failed in employing counsel to appear for him, and the court appointed two attorneys, R. L. Russell and H. R. Brown, to represent his interests in the trial court. There is nothing in the record with reference to their experience in criminal trials. It is stated by present counsel in his brief that attorney Russell was the postmaster at Princeton and was obliged to devote at least eight hours a day to the performance of the duties of that office and therefore could give very little attention to preparation for the trial of this case, and that attorney Brown had had a very limited experience in the trial of criminal cases. He also insists that the record shows conclusively that by their mismanagement of the trial and by their bringing in evidence which was immaterial and prejudicial to plaintiff in error, and allowing the admission, without objection, of other improper evidence, they clearly proved themselves incompetent, and that under the reasoning of this court in · *People* v. *Blevins,* 251 Ill. 381, it was the duty of the trial court to interfere when they were bringing out improper evidence, in order to protect the interests of plaintiff in error, or that a new trial, under the reasoning in the case just cited, should be granted for that cause alone. We have compared, so far as possible, the evidence bearing on this question as found in the *Blevins case, supra,* with the evidence found in this case, and we find the situation on the question of inexperienced attorneys and the reason for there being error in that regard in the *Blevins case* very differ-

289 — 32

ent from what it is here.    In the *Blevins case* the record
shows that there were three experienced attorneys prose-
cuting, two of them employed by private parties; that the
counsel there appointed by the court to defend the accused
were only appointed two days before the trial opened, and
that they made a motion for a continuance in order to make
preparation of the case, which was overruled.    In the case
at bar, so far as the record shows, there was ample time to
prepare for the trial and counsel for plaintiff in error were
not overmatched in experience by the counsel for the State.
The State's attorney, himself a comparatively young man,
prosecuted the case alone, while two lawyers, one of whom
had, apparently, had more years of experience, defended and
looked after the interests of accused.    While it is true that
counsel for plaintiff in error did draw out some evidence
from the witnesses with reference to the relations of plain-
tiff in error and the deceased before the shooting that it
is now claimed by present counsel was improper, we are
of the opinion that this evidence could have been properly
introduced by the State as against plaintiff in error.    This
matter we will discuss later in the opinion.    This question,
and other questions as to whether certain evidence was im-
properly admitted through the incompetency and inexperi-
ence of counsel for plaintiff in error or could have injuri-
ously affected plaintiff in error, are questions upon which
there might be a difference of judgment by the best trial
lawyers.    It is manifest that no two cases are exactly alike
on the question of the employment of private counsel to
prosecute or the competency or incompetency of the lawyers
for the accused.    Each case must in a large measure be
decided on its own special facts.    In the *Blevins case* this
court did not reverse solely because of the incompetency
of the counsel for the accused.    While the court did say
that under the circumstances there shown the trial court
had not properly protected the interests of the defendant,
we think it is clear that that was only one of the causes,

and not the principal one, that moved this court to reverse the case. We are of the opinion that this record does not show any such incompetency of counsel for plaintiff in error as to justify the court in reversing the case or to lead to the necessary conclusion that plaintiff in error's interests were injuriously affected by the incompetency and inexperience of his counsel.

Counsel for plaintiff in error argues at length that the evidence as to the relations of plaintiff in error with the deceased, and the fact that plaintiff in error bore ill-will to the deceased because he thought Blanco had had improper relations with his wife in Spain years before and because he thought Blanco was having improper association with the Alvirez woman in DePue, was so incompetent that the court should have refused to admit it, even though it was originally brought out by the inquiries of counsel for plaintiff in error. With this we cannot agree. It is always relevant to put in evidence of jealousy and unrequited love, and the facts on which they rest, for the purpose of showing motive in homicide. (2 Wharton on Crim. Evidence,—10th ed.—1544, 1693; 21 Cyc. 919.) Counsel for plaintiff in error insists that this evidence is incompetent because it happened so long before the shooting; that the alleged relations of Blanco with plaintiff in error's wife were years before, and the evidence shows that Blanco had not had anything to do with Josephine Alvirez for two or three months before the shooting, and that therefore the shooting could not have been caused by the jealousy of plaintiff in error, and that his threats were that if Blanco did not leave the woman alone he would make trouble; that Blanco had left the woman alone for several months, and therefore there was no reason for plaintiff in error to be jealous of him. The evidence of Mrs. Menendez, the wife of the proprietor of the house where the shooting occurred, was to the effect that plaintiff in error had said to her that he had seen the deceased in a saloon some two weeks before the

shooting, and that if the deceased did not leave the Alvirez woman alone there would be trouble. It is therefore quite evident that plaintiff in error retained the jealous feeling up to a brief time before the shooting. The evidence of the belief of plaintiff in error as to the relations of deceased with his wife and as to the more recent relations with Josephine Alvirez that he believed to exist, even if without foundation, we think was proper to show motive, and the fact that the relations with the wife had been years before would naturally add to the feeling of plaintiff in error with reference to the deceased in the action he believed Blanco was taking with reference to the woman he (plaintiff in error) might marry. Under the reasoning of the authorities already cited, and of *Everett* v. *State,* 62 Ga. 65, *Marler* v. *State,* 68 Ala. 580, *Templeton* v. *People,* 27 Mich. 500, *State* v. *Lawlor,* 28 Minn. 216, and *McCue* v. *Commonwealth,* 78 Pa. St. 185, there was no error in admitting this evidence.

We cannot agree with the argument of counsel for plaintiff in error that there was no evidence in this case to warrant the argument of counsel for the State that plaintiff in error shot and killed Blanco from motives of jealousy.

In this connection it is also argued by counsel for plaintiff in error that the trial court erred in admitting testimony with reference to the meaning of certain Spanish words which it was claimed plaintiff in error had used in talking about the deceased; that the testimony of one Leon was to the effect that in the month of May before the shooting witness had a talk with plaintiff in error, and he told the witness that Blanco was living with Josephine Alvirez and that Blanco was the cause why he was not living with the woman, and that he had to buy a revolver "to take him from sight." The dispute is over the proper translation of the Spanish words which were translated by the interpreter to mean "to take from sight." It appears that most of the witnesses were Spanish and could not talk

English and that an interpreter was required; that plaintiff in error talks English very poorly; that an interpreter named Pina was employed, who interpreted for both sides. The record shows that for some reason another interpreter, named Lorenzo, who the bill of exceptions states was well qualified to interpret the Spanish into English and the English into Spanish, was appointed to act as interpreter exclusively for plaintiff in error's counsel during the entire preparation of all the evidence therein and throughout the entire trial. The record does not show that Lorenzo took any active part in the trial of the case, although it does appear that he, by suggestion or otherwise, helped to examine at least one witness. The regular interpreter said that the words Leon testified were used were "quitar de lantre;" that these words mean "to take from sight," or "to kill." Another witness, Marie Blanco, who testified that she understood English and Spanish, testified that those words meant "to kill somebody;" that when used with this last meaning the words were considered in Spanish a slang expression; that when used with the ordinary meaning they meant "to get or take out of sight." On the motion for a new trial an affidavit by Tristan Melendreras was filed on behalf of plaintiff in error, stating that he was employed as secretary at the Spanish consulate in Chicago; that he had been holding this position for over two years, preparing legal documents for the consulate and in charge of the Spanish correspondence; that the words "quitor de lantre" have no meaning in the Spanish language; that the man who used words of similar sound must have said "quitar de delante," which means in idiomatic English, "Get out of my way," or "Go away from me;" that the Spanish for "to kill somebody" is "matar a alguien." It is argued by counsel for plaintiff in error that the admission of these words and their translation in the trial court were most injurious to plaintiff in error.

This court, in discussing the object of interpretation and the manner in which an interpretator should translate, said in *Schnier* v. *People,* 23 Ill. 11, on page 22, that the object of all evidence is to inform the jury or tribunal to whom the issue is submitted, of all the facts in dispute, precisely as they occurred. The nearer that tribunal can, through the aid of evidence, become eye and ear-witness of the transaction the nearer will it be enabled to do strict justice between the parties; that to properly interpret, it is always desirable that the witness shall, as far as possible, detail to the jury the very same language, in precisely the same connection in which it was employed by the person using it, otherwise it will necessarily be merely an accident if the jury obtain the sense in which it was spoken; that when an interpreter is employed "it is his duty to translate the evidence given by the witness into equivalent terms of the language employed by the tribunal trying the cause. All persons are aware of the fact that the power to make a literal translation from one language to another, so as to preserve in the translation the precise meaning of the original, depends upon an accurate knowledge of both languages by the translator. This being the office of an interpreter, if the person employed is not well versed in each language he is liable to fail in giving the jury the facts, circumstances, conversations and admissions just as they were detailed by the witness, and if that is not done the party against whom the mistake is made must suffer wrong unless he shall be permitted to call others who are more capable of translating the language accurately." We agree fully with the reasoning of this opinion on this question. So far as we can ascertain, every opportunity was given plaintiff in error and his counsel to have a proper interpretation of the disputed words during the trial. We cannot say, even in the light of all the evidence in the record, that plaintiff in error was injuriously affected by an improper translation of the disputed words. We think it is evident

from the testimony of the witness Leon that plaintiff in error, regardless of the meaning of the Spanish words used, was making serious threats against the deceased. Furthermore, there were several other witnesses who testified to threats of as serious a character where the meaning of words not given in Spanish is not questioned, so that, even if the witness Leon misinterpreted or misunderstood the Spanish words used, we cannot see how it seriously affected the material issues in the case prejudicially to the plaintiff in error. We find nothing in this record that justifies the criticisms of present counsel for plaintiff in error that the judge acted improperly with reference to the interpreters who were employed during the trial of the case. Indeed, we are disposed to think that the record shows he took extra precautions to protect the interests of plaintiff in error. We find nothing in the record to show that either of the interpreters employed during the trial was incompetent to act in that capacity.

Along with other alleged improper rulings of the court as to the admission of testimony, counsel for plaintiff in error complains that the court improperly admitted evidence as to his client's relations with the Alvirez woman and the fact that he lived with her in an open state of adultery. Under the authorities already cited we think this evidence was properly admitted in order to show the relations between deceased and plaintiff in error and that plaintiff in error had a motive for shooting Blanco. The test of admissibility is the connection of the facts proved with the offense charged, and whatever testimony tends directly to show the defendant guilty of the crime charged is competent, although it also tends to show him guilty of another and distinct offense. *People* v. *Moeller*, 260 Ill. 375; *People* v. *Jennings*, 252 id. 534.

Counsel for plaintiff in error argues that serious prejudicial error was committed by the trial court in the giving of instructions. He first complains of instruction 14 because it instructs the jury that if they believe, beyond a rea-

sonable doubt, that plaintiff in error killed the deceased in manner and form as charged in the indictment, "not in self-defense as defined in these instructions," etc. The objection seems to be mainly to the words just quoted, and if we understand the argument it is that the doctrine of self-defense was not correctly defined in the other instructions. If it was correctly defined in the other instructions then there certainly can be no valid objection to instruction 14. It needs no citation of authorities to make clear that this court has always held that instructions should be considered as a series and that it is not improper to refer in one instruction to another.

The principal objection to the instructions concerning self-defense is to instruction 15. This instruction is an exact copy of sections 148 and 149 of the Criminal Code. It is complained that this instruction eliminates the question whether the danger was actual or only apparent. While it has been sometimes said the giving of an instruction containing one of these sections alone might be misleading as relating to the doctrine of self-defense, this court has frequently held that the giving of an instruction containing these two sections, fairly connected, stated the law of self-defense and was not misleading. (*Gainey* v. *People; supra; Kinney* v. *People,* 108 Ill. 519; *McCoy* v. *People,* 175 id. 224; *Kipley* v. *People,* 215 id. 358; *Parsons* v. *People,* 218 id. 386; *People* v. *Simpson,* 270 id. 540.) Counsel for plaintiff in error concedes that the court has so held in those cases but argues that this case should be distinguished; that in at least some of those cases, notably *People* v. *Simpson, supra,* the instruction containing these sections of the Criminal Code was given in connection with other instructions which clearly advised the jury under what circumstances a reasonable person would have reasonable ground to believe that he was in danger of losing his life or suffering great bodily harm and that men threatened with danger were obliged to judge from appearances. Instruction 24 given

in this case stated the doctrine of self-defense as fully and strongly as that doctrine has been stated in *Campbell* v. *People,* 16 Ill. 17, and in a long line of decisions of this court approving that doctrine, as late as *People* v. *Scott,* 284 Ill. 465. Counsel for plaintiff in error attempts to distinguish this case from the others by stating that it seems that in *People* v. *Simpson, supra,* and other cases, more than one instruction was given which stated correctly the doctrine of self-defense, while in this case there was only one such instruction. We do not think the cases can be distinguished on that ground. This court has more than once stated that to give one instruction on a certain subject, clearly stating the law, was often better practice than to give several instructions stating in varying terms the law on that one topic; that several instructions on the same subject might tend to mislead rather than assist the jury in reaching a correct conclusion. In view of the series of instructions given in this case and the entire record before us, we do not think the trial court committed error in giving instruction 15 here complained of.

Counsel for plaintiff in error also objects to the giving of instruction 17, in which it was stated that the right of self-defense did not imply the right to attack in the first instance, he arguing that there was no evidence to warrant the giving of this instruction or in any way justifying the jury in believing that plaintiff in error was the attacking party in the struggle. Several witnesses swore to threats having been made by plaintiff in error against the deceased, caused by his belief that Blanco was giving attentions to Josephine Alvirez. There is also evidence in the record which tends to sustain the argument that plaintiff in error preceded Blanco into the kitchen and there lay in wait for him, and that as soon as Blanco came from the dining room into the kitchen began shooting at him. While the evidence is not in absolute accord as to the length of time after Blanco went into the kitchen before the shooting began, all

of it is to the effect that the first shot was fired very shortly after Blanco went into the kitchen, and there is evidence tending to show that there was no noise or loud conversation or quarreling between plaintiff in error and Blanco before the shooting began. Reading the seventeenth instruction as a part of the series we do not think it was possible for the jury to have been misled prejudicially to the interests of plaintiff in error by its being given.

On the motion for new trial several affidavits were filed which it is contended by counsel for plaintiff in error required the granting of such motion. One of the principal affidavits relied on by counsel is that of Tristan Melendreras, secretary of the Spanish consulate in Chicago, already referred to. Most of the other affidavits referred to evidence that was merely cumulative with reference to the conditions existing in the dining room at the time and shortly before the shooting and as to the time which elapsed after deceased left the dining room before the shots were fired. Some of the affidavits were impeaching in their character as to certain of the witnesses who testified during the trial. It is a familiar doctrine that a new trial will not be granted merely for the purpose of admitting inconclusive, cumulative testimony or impeaching testimony, especially where there has been a lack of proper diligence to procure the evidence on the trial. (*Friedberg* v. *People,* 102 Ill. 160; *Grady* v. *People,* 125 id. 122; *Harter* v. *People,* 204 id. 158; *People* v. *McCullough,* 210 id. 488; *People* v. *Wright,* 287 id. 580.) The law is also that the granting of a motion for new trial on newly discovered evidence rests largely in the sound discretion of the trial court. (16 Corpus Juris, 1205; 1 Bishop's New Crim. Proc. sec. 1274.) We do not think the record shows due diligence in obtaining the newly discovered evidence set forth in some of these affidavits. Several of the affidavits were made by witnesses who testified at length at the trial, and, of course, there was every opportunity then for obtaining a full knowledge as to all

that such witnesses knew with reference to the material is-
sues. Applications for new trial on the ground of newly
discovered evidence are not looked upon with favor by the
courts, "and in order to prevent, so far as possible, fraud
and imposition which defeated parties may be tempted to
practice as a last resort to escape the consequence of an ad-
verse verdict, such applications should always be subjected
to the closest scrutiny by the court, and the burden is upon
the applicant to rebut the presumption that the verdict is
correct and that there has been a lack of due diligence. The
matter is largely discretionary with the trial court, and the
exercise of its discretion will not be disturbed except in a
case of manifest abuse." (20 R. C. L. 289, 290.) Under
the circumstances here appearing in this record, some of
these affidavits as to newly discovered evidence come obvi-
ously within the rule just referred to and should be sub-
jected to the closest scrutiny, in order that the court might
not be misled by parties who might be attempting to prac-
tice fraud or imposition upon the court in order to enable
plaintiff in error to escape the consequences of an adverse
verdict. We cannot say, on this record, that it has been
affirmatively shown that due diligence was used by plain-
tiff in error or his counsel to ascertain, search out and find
the evidence offered in the affidavits, neither do we feel
sure that if such evidence had been procured and presented
to the jury a different verdict would have been reached.

We find no reversible error in the record. The judg-
ment of the circuit court will therefore be affirmed. The
clerk of this court is directed to enter an order fixing the
period between nine o'clock in the forenoon and five o'clock
in the afternoon of the twelfth day of December, 1919, as
the time when the original sentence of death entered in the
circuit court of Bureau county shall be executed. A certi-
fied copy of that order will be furnished by the clerk to
the sheriff of Bureau county.          *Judgment affirmed.*