GLORIA SENIUTA, Plaintiff-Appellee, *v.* JOHN SENIUTA, Defendant-Appellant.

(No. 60649;

First District (5th Division)—July 25, 1975.

Haas & Dienstag, Ltd., of Chicago (Gary E. Dienstag, Adolph L. Haas, Joseph H. Becker, and Norman Becker, of counsel), for appellant.

Wachowski & Wachowski, of Chicago (Casimir R. Wachowski and Andrew A. Ziemba, of counsel), for appellee.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal by defendant from a decree granting plaintiff a contested divorce, giving her custody of the three children of the parties and awarding her alimony in gross. Plaintiff sued on grounds of physical cruelty and adultery. Defendant cross-complained, alleging adultery. On appeal, defendant contends (1) plaintiff failed to sustain her burden of proving condonation of her admitted adultery; (2) the court erred (a) in privately examining two of the parties' minor children, depriving defendant of his right of cross-examination and (b) in allowing certain testimony of defendant's mother, a witness for plaintiff, which was in-

correctly translated by the interpreter; and (3) the award of alimony in gross was improper, excessive, and not based on plaintiff's needs and defendant's ability to pay.

At the hearing on the issue of divorce in a bifurcated trial, plaintiff testified that defendant struck her on two separate occasions in February, 1973. Specifically, she stated he beat her with his fist on February 10, and on the evening of February 16 extending into the early morning of February 17 he struck her with his hand and fist. From each she suffered pain and developed black and blue marks. She left with the children on the 17th and has been living separate and apart since then. Prior thereto, in January, 1972 defendant had accused her of committing adultery with two other men but said he would forgive her if she admitted the acts. She made the admission and, at the same time, asked his forgiveness. Thereafter, she and defendant continued to live together as man and wife in the same apartment, sleeping in the same bed, until she finally left on February 17, 1973. While they were living together, she performed her domestic duties and rendered services in connection with the operation of defendant's buildings. She had sexual intercourse with defendant when he requested it. After she had admitted her adultery and before the two instances on which defendant had struck her in February, 1973, she left defendant on three occasions—in April, June and September, 1972—but returned to the marital domicile each time.

During one of these absences, in April, 1972, she filed a complaint for separate maintenance, which included an allegation that she had a partnership interest in the properties acquired by defendant which were held in a land trust. This complaint was dismissed in May, 1972, when defendant, as a condition of plaintiff's agreement to return, conveyed to her one-half of his interest in the parcels of realty. The next day she executed reassignments to him on his promise that he would stop hitting her and would spend more time at home with her and the children. In 1971 defendant had told her that he was seeing another woman, and in the summer of 1972 he showed her some pictures of that woman and again said he was seeing and living with her. When they separated on the second occasion in June, 1972, she directed defendant's attorney not to transfer the reassignments of the property interests to the land trustee. They separated again in September, 1972 and thereafter, when they resumed their marital life, defendant threatened to kill her or ruin the buildings if she did not reconvey the property interests. She did so in October of that year.

Defendant's mother testified in Polish, through an interpreter, that she had seen bruises and blue marks on plaintiff's body on February 10, 1973, and saw marks on plaintiff's head, breasts and legs a few days after plain-

tiff left defendant for the last time.[1] She had observed plaintiff working in and around two of the buildings, noticing that she cleaned apartments, helped to furnish them, showed apartments to prospective tenants, collected rents, and kept records. During the time she lived with the parties, she had seen her son strike plaintiff but she did not remember the exact dates. In his translation of her testimony, the interpreter apparently made mistakes concerning the dates, but they were corrected by defendant or his attorneys, who apparently understood the language.

Irving Niehart testified that he had been the janitor in the 636 Waveland Avenue building, and he observed that initially plaintiff kept the books on the property and later on, when it was changed over to furnished apartments, she had on many occasions carried furniture, cleaned the apartments, collected rents, and burned garbage in the boiler room and shoveled coal into the hoppers to feed the boiler. He had helped plaintiff carry furniture up to the apartments during this change-over period. He also stated that plaintiff showed the apartments to prospective tenants.

Two of the children of the parties (boys aged 12 and 15) were called as witnesses for plaintiff. The trial court interviewed the boys privately on motion of plaintiff. Defendant's objection that he would be deprived of his right of cross-examination, was overruled. Following the interview, the court reported, among other things, that one boy said his mother signed over the properties to defendant because the latter threatened her. The other boy said his father threatened to ruin the properties and go into bankruptcy if his mother didn't sign over her interest in them. One of the boys said that in February, 1973, he saw defendant strike plaintiff, and the other boy observed defendant strike plaintiff on the day before she and the boys left defendant.

Defendant denied striking plaintiff on the occasions she alleged but admitted that during the period of time which included those dates, he had thrown a toy automobile which struck her and drew blood. He further testified that after his alleged condonation of plaintiff's adultery he had accused her of various other acts of adultery with others, including Irving Niehart, and that plaintiff impliedly admitted these other charges by her reply that she could not help herself because, "I am just that way."

In rebuttal on the divorce issue, plaintiff was recalled and she denied any acts of adultery other than those she had admitted to her husband and further denied that she had made the statements to her husband, indicating that she could not help herself. Then Irving Niehart, one

---

[1] Plaintiff testified she left defendant on February 17, 1973.

of the men with whom defendant alleged plaintiff had committed adultery, was called and he denied any sexual relations with her.

The trial court found that the testimony of plaintiff concerning acts of physical cruelty, corroborated by the testimony of defendant's mother, entitled plaintiff to a divorce; that plaintiff's defense of condonation of her admitted adultery was established by the evidence that defendant took her back, lived with her and conveyed the real estate to her; and that the evidence was inconclusive on both plaintiff's allegations of adultery by defendant and his charges of other acts of adultery by plaintiff. Custody of the children was awarded to the mother, with visitation rights to defendant.

At the hearing on the question of alimony, the following evidence was presented with respect to the buildings, all in Chicago, in which defendant held interests:

1. 5050 Sheridan Road, which has 165 apartments and 5 stores. It was purchased in 1968 for $730,000 and is encumbered by a first mortgage of $500,000 with monthly payments of $3,600 plus taxes and insurance, on which a balance of over $412,000 remained unpaid. Principal and interest payments amounted to $3,600 per year. Real estate taxes for 1972 of $93,730 were deposited in escrow. The 1973 partnership income tax return indicates a loss of $39,182.04.

2. 4246 Sheridan Road, which has 120 furnished apartments. The 1967 purchase price was $540,000. There was an unpaid first mortgage balance of $111,205 and a second mortgage with an unpaid balance of $64,727.86 as of January 1, 1974. Payments on the first mortgage were current but they had not been made on the second mortgage for the first 4 months of 1973, and the tax escrow payments were not current. The 1973 partnership income tax return discloses a loss of $9,111.58.

3. 1608 North Milwaukee Avenue is a 12-story office building, purchased in 1967 for $95,000, with mortgage payments of $909.75 per month and, as of April 1, 1974, the balance due was $56,929.01. No real estate taxes have been paid for the past 3 years, with a balance in excess of $100,000. The 1973 income tax returns, which did not take into account the tax expense and mortgage payments (because none was paid) shows an income of $499.67.

4. 626-40 Waveland Avenue is a 100-unit apartment building purchased in 1963 for $563,500, having a first mortgage balance of $52,511.32 and a second mortgage balance of $118,835.43. This property was sold on contract for $920,000 in 1969—$120,000 of which was paid at the time of closing. As of December 31, 1973, the balance owed is over $736,000, with 19 years remaining. The monthly payment is $6,196.09, of which some $2,965 is paid monthly by the contract purchaser directly to the holder

of the first mortgage; $618 paid monthly directly on the second mortgage, together with tax escrow payments of $3,157.12; and $2,613.09 paid directly to the Bank of Chicago in repayment of two personal loans totalling $150,000, which had a current balance of over $101,000. To secure these notes defendant had pledged his entire property holdings, including his interest in the contract for the sale of 624-40 Waveland.

All four buildings are held in a land trust. Defendant owns 55% of the beneficial interest in the 5050 Sheridan Road building; 80% of the beneficial interest in the 4246 Sheridan Road building; 100% of the beneficial interest in the Waveland Avenue building and 50% of the Milwaukee Avenue property.

Plaintiff testified concerning her expenses and those of the children. Excluding the cost of this litigation, the amount totals approximately $1,200 per month, not including needed medical and dental expenses, which would require further expenditures.

Jerome Ellen, a witness for plaintiff, testified he is an accountant who examined defendant's cancelled checks and original books of entry and the rent roll for the 5050 Sheridan Road building. He could not determine from them whether defendant made or lost money in 1973. The only records he examined for the 4246 Sheridan Road building were three bank statements and cancelled checks for the first 3 months of 1974. He did not examine defendant's personal accounts for 1973. On cross-examination, Ellen admitted that he had no reason to believe the 1973 income was greater than shown to him on the records of the buildings he examined; the excess profits that appeared in those records could have resulted in transfers from other accounts. He did not examine the expenses, nor the payments made on the mortgages, and he had no reason to doubt the figures shown on the partnership return. He also stated that he had never seen an appraisal of any of the buildings and that the book value shown in defendant's balance sheet had nothing to do with the value of the property today. He could not tell whether the buildings were making money or losing money, and he did not know the net income or loss of any of the buildings.

John Pelesh testified for defendant that he was an accountant who did all of the bookkeeping for defendant since he purchased the first building in 1963. He also prepared defendant's personal and partnership returns. He stated that defendant would transfer money from one building to another whenever it was needed. Defendant did not take any money from the building; when he withdrew it he redeposited it later. Any monies received by him were not shown on the partnership return—only on the books. However, if he had received money and not redeposited it, it would show on the partnership return under a reduction of capital. De-

fendant received no cash from the 4246 building in 1973. The cash requirement for 5050 Sheridan Road was $248,000 in 1973—$42,000 more than its income. More money was paid out in expenses than was received in income on this building, and none of his partners contributed any money to those buildings. The difference was made up by transfers from the other buildings. He testified that where everything is pledged and heavily mortgaged, as in the case of these properties, there is no way of knowing what the equity is. If all of the people holding the various dated instruments were to foreclose, it would be difficult to determine whether anything would be left. The properties have not been appraised and, because these properties are in distressed areas, there might be a personal liability over and above the equity. The 1608 North Milwaukee building had a net income before depreciation of $499, which did not include a number of unpaid bills nor an accrual for taxes.

He stated that defendant's personal return showed an interest income of almost $56,000, but that this was the total of the monthly payments received from the sale of the Waveland property and that he did not actually receive the money, as all of it was applied directly to his mortgages and notes. In his opinion, defendant lost money in 1973. On cross-examination, he stated that a tax levy had been filed by the Internal Revenue Service against the properties and that the real estate taxes increased by 30% on the 5050 building, with a substantial increase of the taxes on the 4246 building, and he testified there was a shortage in the tax escrow accounts for both buildings.

There was additional testimony from plaintiff that she and defendant lived in New York in an apartment behind their grocery store, which was acquired through money defendant earned as a tool and die maker. He developed a machine, which he sold in 1961 for $75,000, and they moved to Chicago where, in 1963, that money was used as a down payment to purchase the 626-40 Waveland building. She testified that a building at 642-48 Waveland was acquired later which was subsequently sold. Then early in 1967 the 4246 Sheridan Road building was purchased, and in October, 1967, the Milwaukee Avenue office building was acquired. Thereafter, in July, 1968, 5050 Sheridan Road was obtained. She did not participate in the negotiations for the purchase of any of the buildings, and her name was not included in the title for any of them.

Plaintiff also testified that she kept the books at some of the buildings and performed various services at all of the other buildings, including the preparation of leases, the renting and cleaning of apartments, the removal of garbage, and the carrying of furniture.

It was defendant's testimony in this regard that no money of plaintiff was used in the purchase of any of the buildings, nor did she participate

in the negotiation for financing of their purchase and that she performed no services on any of them.

Orest Popel, defendant's attorney in the acquisition of the various properties, testified that to his knowledge plaintiff performed no services on any of the buildings.

Florence Sheers testified she was the manager at 4246 Sheridan, where she did the bookkeeping, and she stated that plaintiff did no work on the building other than to accept rent and write receipts therefor on the witness's day off.

The trial court then entered the supplemental decree of divorce, and the matters here in contention appear in paragraphs C and D thereof. In paragraph C, the court ordered the conveyance of defendant's interest in the 5050 Sheridan Road building to plaintiff as an award of alimony in gross, with a requirement that defendant vacate the two apartments occupied by him and providing for a permanent injunction prohibiting defendant from interfering in the operation and management of the property. In addition, defendant was directed to indemnify and hold plaintiff harmless from the following: (1) All debts, obligations, expenses, interest, penalties, attorneys' fees, court costs and costs of litigation concerning all indebtedness incurred to the property prior to the date plaintiff acquired possession; (2) as to all expenses and costs with regard to the trust deed and installment note dated July 31, 1968, executed by LaSalle National Bank, as Trustee and Chicago Title and Trust Company, as Trustee; (3) from all obligations, expenses and costs relating to two installment notes payable to the order of the Bank of Chicago (one in the amount of $125,000 and the other in the amount of $25,000); (4) a note payable to the order of Self-Reliance Credit Union in the amount of $115,000; and (5) all taxes due and expenses incurred therefrom.

In ordering the conveyance of defendant's interest in the 5050 Sheridan Road building, the trial judge stated that it would be impractical, as requested by plaintiff in her complaint, to order a reconveyance to plaintiff of a one-half interest in all the properties of defendant in view of the fact that they were divorced, and he then stated, "The only way that I can see to work this case out—and it is going to be difficult under the best of circumstances—is to direct the husband to convey to the wife his 55% interest in the property at 5050 Sheridan Road and hold her harmless on the notes * * *."

OPINION

Concerning the decree of divorce, defendant presents three issues for

review. First, he asserts error in that the trial court deprived him of his right to cross-examine two of his children, called as witnesses by plaintiff, who were interviewed privately by the court.

■■ It has been held to be improper for the court to conduct an interview with a child out of the presence of the attorneys and off the record to receive testimony bearing on the issues of the trial. (*Albert v. Albert,* 340 Ill.App. 582, 92 N.E.2d 491.) However, since *Oakes v. Oakes,* 45 Ill. App.2d 387, 195 N.E.2d 840, the rule has been that the welfare of the child is paramount in custody decisions and, in that regard, interviews with the children by the court are permissible. (See also *Levy v. Levy,* 117 Ill.App.2d 194, 254 N.E.2d 108.) Thus, the rule presently appears to be that a private interview with children involved in a divorce proceeding is permitted to assist the court in determining custody but "[t]o protect the right to appeal, the court upon motion should state for the record, if that becomes necessary, the substantive parts of the child's statement to him." (*Oakes v. Oakes,* 45 Ill.App.2d 387, 394-95.) However, a child's testimony as to other issues should be given in the presence of the parties and their counsel, unless there is a waiver thereof. *Albert.*

Here, over the objection of defendant, the trial judge conducted a private interview with both children. He then read into the record the substance of each interview, which included among other things the fact that each had seen defendant strike plaintiff, each had seen bruise marks on plaintiff's body, each stated plaintiff and defendant did not get along very well and had argued over ownership of the properties. One of the boys also said plaintiff had signed over the property because defendant had threatened her; the other stated defendant said he would ruin the properties and go into bankruptcy if plaintiff did not sign over her interest in the property.

■■ Thus, it would appear that the interview, to the extent that it developed information on issues not related to custody which may have been considered by the trial judge in resolving those issues, was improper. We note, however, from our examination of the record, that the testimony of plaintiff concerning defendant's acts of cruelty was supported by defendant's mother and was denied only by defendant. Furthermore, corroboration is not required in a contested divorce proceeding. *Surratt v. Surratt,* 12 Ill.2d 21, 23, 145 N.E.2d 594; *Varap v. Varap,* 76 Ill.App.2d 402, 222 N.E.2d 77; *Bilsky v. Bilsky,* 18 Ill.App.3d 329, 333, 309 N.E.2d 697.

■■ Under such circumstances, we believe that the information obtained from the children concerning the alleged acts of cruelty would be merely cumulative and would not constitute reversible error. See *Logue v. Williams,* 111 Ill.App.2d 327, 250 N.E.2d 159.

Secondly, defendant asserts error in the denial of his motion to strike the testimony of his mother, a witness for plaintiff. He argues that (1) her testimony was unreliable because the interpreter did not correctly repeat the questions to and the answers of the witness; and (2) her testimony was not corroborative as stated by the trial judge in his findings, because she never stated the time and place she observed defendant strike plaintiff and because plaintiff testified that no one else was present when the alleged acts of cruelty occurred.

■■ An interpreter's account of the answers of a witness need not be literal as long as the answers of the interpreter and the witness amounted to the same thing. (*People v. Murphy,* 276 Ill. 304, 320, 114 N.E. 609; 14A Ill. L.&Pr. *Criminal Law* § 496 (1968).) There are situations in which he may testify to the sense in which he understands the witness. *Schnier v. People,* 23 Ill. 11, 23; see also *People v. Laures,* 289 Ill. 490, 124 N.E. 585.

■■ In the instant case, plaintiff testified to acts of cruelty on February 10, 16 and 17, 1973, and that she left the marital home on the latter date. Although defendant's mother was not specific as to dates and places, it was her testimony that on February 10 she saw marks on plaintiff's body and that a few days after plaintiff left defendant for the final time, she saw marks on plaintiff's legs, hand and breasts. This testimony justified the trial court's finding that plaintiff's testimony as to acts of cruelty was corroborated.

In addition, although defendant's mother could not communicate in English, it appears that her testimony was given through an interpreter whose qualifications were stipulated to by defendant's attorney and, as corrected by defendant and his attorney, it was considered sufficiently credible to the trial court. From our review of the record, we do not disagree with his judgment in that regard and, under these circumstances, we find no error in the refusal of the court to strike the testimony of defendant's mother.

Thirdly, defendant argues that plaintiff failed to establish her defense of condonation to the charge of adultery. Plaintiff testified she had committed adultery on three occasions in 1963 or 1964 with two individuals and that she told defendant of this conduct in January of 1972. Thereafter, except for the periods of separation, they engaged in sexual intercourse, resided in the same apartment, and slept in the same bed. Plaintiff maintains that this conduct, when considered with the fact that defendant subsequently conveyed to her a one-half interest in his properties, sufficiently established condonation. Defendant disagrees, stating that "plaintiff's own evidence disclosed that defendant did not treat her with kindness after her admitted adultery." He argues that the continued marital

difficulties negated the required intent to forgive, and he suggests that condonation should not be based on the one statement allegedly made by him to plaintiff that he had promised to forgive if she admitted her acts. He analogizes this case to *Deahl v. Deahl*, 13 Ill.App.3d 150, 300 N.E.2d 497, where a defendant's condonation defense to a charge of mental cruelty was rejected. In *Deahl*, the court found that plaintiff did nothing more "than continue to live in the same house with her husband and occasionally have sexual relations with him." (13 Ill.App.3d 150, 157.) The *Deahl* court held this was insufficient to establish condonation, because there was nothing in the record disclosing that "plaintiff ever forgave the prior acts of defendant on the condition that the acts would not be repeated and that he would in the future treat plaintiff with conjugal kindness." (13 Ill.App.3d 150, 157.) Here, not only did plaintiff and defendant live in the same house, sleep in the same bed, and have sexual relations, but defendant promised to forgive plaintiff if she admitted the acts of adultery, which she did. Moreover, there is testimony that to induce her to return he promised not to strike her again, and it was established that he conveyed one-half of his property interests to her to assure her remaining at home. Thus, we believe that *Deahl* is not controlling of the facts here. As stated in *Pope v. Pope*, 12 Ill.App.3d 800, 805, 299 N.E.2d 161:

> "The essence of condonation is the recognition that problems affecting the continuity of the marriage have arisen and, notwithstanding prior mistakes or misconduct, there is the understanding and forgiveness to create an appropriate basis for continuing the marriage. (*Quagliano v. Quagliano* (1968), 94 Ill.App.2d 233, 236 N.E.2d 748.) The evidence of the plaintiff's efforts in effecting the reconciliation and in resuming her life with the defendant shows the forgiveness necessary to constitute condonation of her grounds for divorce. That the reconciliation did not prove permanent does not establish the contrary."

We conclude that the transfer of an interest in the properties, coming after the forgiveness, amply proves defendant's intent to resume the marital relation in full. See *Rasgaitis v. Rasgaitis*, 347 Ill.App. 477, 481, 107 N.E.2d 273.

■■ For the reasons stated, it appears to us that there was a sufficient showing of condonation of plaintiff's admitted acts of adultery and we are of the opinion, after a detailed examination of the record, that the trial court properly dissolved the marriage and granted custody of the children to plaintiff, and we affirm those portions of the decree entered February 5, 1974.

Concerning the supplemental decree, entered May 8, 1974, although

appealing from this order, we note that defendant does not raise any objection in this court to the following:

1. The provisions of the decree concerning the payment of child support and the medical, dental and college educational expenses of the children (paragraph A and subparagraphs thereof);
2. The judgment of $3,910 for arrearages in temporary alimony and child support (paragraph B);
3. The requirement that defendant pay certain taxes for 1972 and for prior years in which joint tax returns were filed and to indemnify and hold plaintiff harmless from certain expenses with regard to said joint tax returns (paragraph E); and
4. The judgment for $15,000 for plaintiff's attorney's fees (paragraph F).

■■ Accordingly, we affirm each of these uncontested provisions of the supplemental decree.

We now reach the remaining contention of defendant that the award of alimony in gross of his entire interest in the 5050 Sheridan Road building was excessive and inequitable. He insists that the award has deprived him of "his residence, his occupation and his only potential source of income." He points out that plaintiff testified she needed approximately $1,000—$1,300 a month to support herself and the children; that she was employed prior to the marriage and "according to her testimony, during her marriage she did bookkeeping work, rented apartments, made repairs, hauled garbage, collected rents and decorated." Thus, he states that plaintiff has the ability to earn some income, and her needs were not as great as indicated by the court's grant of the building in question, and he argues that by taking the building from him, the court has left him with "virtually no income nor any prospect of same in the near future."

In her brief, plaintiff replies only to defendant's contention that the award would deprive him of his only potential source of income. She states that (1) "defendant is collecting rents from the property located at 1600 North Milwaukee Avenue"; (2) "defendant is presently collecting and receiving $2,613.89 each month from the contract purchasers of the 626-40 Waveland property" and that "this amount is paid directly to the Bank of Chicago for credit to his account"; and (3) "defendant's equity in his property was $610,000 at the time of trial."

We do not believe the record supports any of these three statements. First, the record concerning 1608 Milwaukee discloses that in 1973 the income was only $449.67; that no mortgage or tax payments were made in 1973; that the total amount of the three years of real estate taxes due is in excess of $100,000; and that the balance of the mortgage in default was

about $60,000. Under these circumstances, it appears quite obvious that defendant was receiving no income from that building. Second, it is un-refuted that the $2,613.09 received monthly from the contract purchasers of 626-40 Waveland is paid directly to the Bank of Chicago to repay two notes in the amount of $150,000 which were secured by his interest in all of the properties, including 5050 Sheridan. As of December 31, 1973, there was a balance on these notes of $101,000, which would not be paid off through these monthly payments for over 3 years. Thirdly, defendant's alleged equity of $610,000 appears in the testimony of plaintiff's account-ant, Ellen, who read it from plaintiff's Exhibit 6, which is a personal balance sheet of defendant as of December 31, 1973, prepared by his accountant. The line entry involved is entitled "Equity—at Book Value" and was reached by deducting liabilities from assets. The only assets listed were the monies due on the sale of the 626-40 Waveland property and defendant's personal investments in the remaining properties. It is significant that no appraisals were made and that Ellen testified book value does not normally have anything to do with the fair market value of the buildings. Furthermore, the balance sheet did not take into account the mortgages on the various properties, the notes payable to the Bank of Chicago, the amounts owed for real estate taxes on the buildings, nor defendant's personal mortgage liability on the 5050 Sheridan building. Thus, we believe the evidence does not support the statement of plaintiff that defendant had an equity of $610,000 in the buildings.

Neither do we see any merit to the contention of plaintiff that the in gross award was justified because defendant diverted monies from the buildings for his own purposes. Her accountant testified that some amounts collected for rent in 1973 were not deposited in the month they were collected. He also stated, however, that he was not aware of the cash requirements of the buildings and didn't know whether the amounts were subsequently redeposited. Defendant's accountant testified that these monies were either redeposited or were shown as withdrawals on the partnership income tax return. Plaintiff's accountant further testified that he had no reason to doubt the partnership return and that he did not know, from his examination of limited records, whether "defendant is making money or losing money."

We will take judicial notice of the fact that there have been foreclosures of the mortgages on the 1608 Milwaukee and 4246 Sheridan Road build-ings. (See *People v. Siglar*, 49 Ill.2d 491, 274 N.E.2d 65.) In the former, a judgment has been entered against defendant in the amount of $60,-315.06 (*Self-Reliance Credit Union v. Seniuta*, No. 73 L 17811) and, in the latter, judgment has been entered against defendant for $175,000 (*Connecticut Mutual Life Insurance Company v. Senitua*, 73 CH 6217).

Thus, it is indicated from the record that at the time of trial, for all practical purposes, the only assets of defendant having significant value were (1) the 5050 Sheridan Road building; and (2) the monthly contractual payments on the sale of the 642-48 Waveland Avenue property. These monthly payments of $6,196.09 are not received by defendant, although they are taxable as income. They are sent by the contract purchaser to the Bank of Chicago to pay off existing mortgages and notes. If the payments continue, the notes will be paid off sometime in 1977 and the mortgages in 1978. In any event, no part of these monies will be available to defendant until then. Moreover, the record discloses that the Internal Revenue Service has placed a levy on defendant's property of over $25,000 for 1972 personal income taxes; that he owes Dr. Farion $20,000, the Diamond Coal Company $20,000, and the State of Illinois approximately $2,400; and that he is the personal guarantor of the payment of a promissory note signed by the purchaser from defendant of the 642-48 Waveland property, the outstanding balance of which was over $101,000 at the time of trial.

We have found nothing in the record which indicates that defendant in recent years has or had any income other than that derived from the sale of the 626-40 Waveland building and the operation of the remaining buildings, of which only 5050 Sheridan appeared to be productive of income. Furthermore, his 1973 personal income tax return shows the monthly payments from the Waveland sale to be his only income.

■■ The authority of courts to compel the conveyance of real property in divorce actions is controlled by statutory rather than by general equity powers. (*Debrey v. Debrey*, 132 Ill.App.2d 1072, 270 N.E.2d 43.) Under section 18 of the Divorce Act (Ill. Rev. Stat. 1973, ch. 40, par. 19), a court may direct a conveyance of realty in lieu of alimony. (*Katauskas v. Katauskas*, 67 Ill.App.2d 33, 213 N.E.2d 420 (abstract opinion).) All that is required is that the receiving spouse be entitled to alimony and that the conveyance be equitable. *Everett v. Everett*, 25 Ill.2d 342, 185 N.E.2d 201.

■■ Here, we are of the opinion that the conveyance, if effected, would not only deprive defendant of his residence and his occupation (which was the operation of his properties) but also of his only apparent source of income. If this was not enough to establish that the decree was inequitable, we believe that it is clearly so when considered with the following facts: (a) That the decree also requires defendant to indemnify and hold plaintiff harmless from all debts and obligations with regard to the property, including the unpaid mortgage balance of $412,000; (b) that by the decree defendant was also required to pay for the support of the children and their medical, dental and college education expenses;

(c) that there is an Internal Revenue Service levy against him of over $25,000; (d) that defendant owes Dr. A. Farion $20,000, the Diamond Coal Company $20,000, and the State of Illinois $2,390.78; (e) that he has personally guaranteed the payment of a promissory note of the purchaser on the 642-48 Waveland building (which has an outstanding balance of over $101,000); (f) that he is enjoined from interfering with the operation and management of the 5050 Sheridan Road building; and (g) that he has judgments against him from the foreclosure proceedings involving the 1608 Milwaukee and 626-40 Sheridan buildings.

■■ Furthermore, periodic payments of alimony are preferable to awards in gross. (*Schwarz v. Schwarz*, 27 Ill.2d 140, 188 N.E.2d 673; see also Neumark, *Property Rights and Divorce*, 62 Ill. B.J. 242 (1974).) It has been held that an award in gross of a conveyance of property is proper only where the record shows that an order for periodic payment of money is not feasible. (*Dmitroca v. Dmitroca*, 79 Ill.App.2d 220, 223 N.E.2d 545; see also 16A Ill. L.&Pr. *Divorce* § 157 (1971).) In *Honey v. Honey*, 120 Ill.App.2d 102, 256 N.E.2d 121, the court observed that the usual and proper procedure is to award alimony in periodic payments, because the questions of the prospective needs of the parties and their ability to meet those demands then remain within the control of the court. See also *Harding v. Harding*, 18 Ill.App.3d 550, 10 N.E.2d 19.

In *Honey*, it was stated at pages 105-06:

> "*   *   * alimony *in gross* may be awarded where the entire record shows that periodic payments are not feasible, as where the record shows that a spouse does not pay his bills or will not work, *Smothers v. Smothers*, 25 Ill.2d 86, 182 N.E.2d 758; *Miezio v. Miezio*, 6 Ill.2d 469, 129 N.E.2d 20; or where the husband was regularly intoxicated and refused to work, *Persico v. Persico*, 409 Ill. 608, 100 N.E.2d 904; or again, where the husband's occupation was so hazardous that he might not be able to continue to produce income, *Rodely v. Rodely*, 28 Ill.2d 347, 192 N.E.2d 347." (120 Ill.App.2d 102, 105-06, 256 N.E.2d 121, 123.)

There is no evidence that any of these situations exist here, and, although plaintiff points to the fact that she was required to file 14 petitions for rules to show cause because of defendant's alleged failure to pay temporary alimony and child support, she does not ascribe this conduct as justification for the in gross award. Furthermore, the record indicates that defendant was never found in contempt therefor; that the arrearage has been paid; and it is asserted by defendant in his brief and not denied by plaintiff that defendant has made regular payments of $150 per week pending appeal, as required by an order of the trial court. In addition, the record discloses there will be available for defendant's use within 2

or 3 years the Waveland property monthly payments of $6,196.09 and, in light of the fact that defendant has been paying the temporary alimony and child support payments during this appeal, apparently from income derived through the operation of the 5050 Sheridan Road building, and because of the possibility that defendant's equity in the two buildings under foreclosure may have some value, we believe that the record indicates that periodic payment of money may be more feasible than the in gross award.

For the reasons given, we reverse those portions of the supplemental decree appearing in paragraphs C and D and their alphabetical subdivisions thereof which, in substance, direct the conveyance to plaintiff of the 5050 Sheridan Road building and which require certain indemnifications to plaintiff, and we remand this cause with directions that the trial court conduct further proceedings to determine an award of alimony not inconsistent with the content of this opinion.

Affirmed in part. Reversed in part and remanded with directions.

BARRETT, P. J., and LORENZ, J. concur.