STATE OF KANSAS, *Appellee,* v. THANH VAN PHAM, *Appellant.*

No. 55,210

STATE OF KANSAS, *Appellee,* v. CAU TRAN, *Appellant.*

No. 55,221

STATE OF KANSAS, *Appellee,* v. NGAN VAN PHAM, *Appellant.*

(675 P.2d 848)

Opinion filed January 13, 1984.

*Geary N. Gorup,* assistant district attorney, argued the cause, and *Clark V. Owens,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the briefs for the appellee.

*David Michael Rapp,* of Moore, Rapp & Schodorf, P.A., of Wichita, argued the cause and was on the brief for appellant Thanh Van Pham.

*James Wilson,* P.A., of Wichita, argued the cause and was on the brief for appellant Cau Tran.

*Janet S. Helsel,* of Offices of Otto J. Koerner, of Wichita, was on the brief for appellant Ngan Van Pham.

The opinion of the court was delivered by

McFARLAND, J.: Defendants Thanh Van Pham, Cau Tran and Ngan Van Pham were convicted in a joint jury trial of two counts of first-degree murder (K.S.A. 21-3401). Each defendant has appealed his conviction and said appeals have been consolidated.

On the evening of June 12, 1982, two Vietnamese men, Den Nguyen and Phong Vihn Thanh Tran were seated at a table in a crowded social club known as the Vietnamese Center which was located at 21st and Arkansas in Wichita, Kansas. According to eyewitnesses the three defendants came into the Vietnamese Center and sat down at the table occupied by the two men. The five gentlemen visited briefly. Thereupon the three defendants stood up, produced guns, and fired a total of 15 to 17 bullets into their hosts. The three defendants then left the building by separate exits and drove away in one car. Additional facts will be stated later in the opinion as are needed in the discussion of particular issues.

The first issue on appeal is alleged error by the district court in refusing to sever the trials of the defendants.

The defendants were all charged in one complaint/information. Each defendant, on appeal, claims error in refusing to sever the trials. We shall first dispose of the issue as it relates to Thanh Van Pham. The record reflects this defendant did not request a separate trial.

K.S.A. 22-3204 provides:

"When two or more defendants are jointly charged with any crime, the court

may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney."

By not requesting a separate trial, Thanh Van Pham has waived the right to make such a request. See *State v. Jones*, 222 Kan. 56, 58, 563 P.2d 1021 (1977).

We turn now to this issue as it relates to defendants Cau Tran and Ngan Van Pham.

On September 3, 1982, defendant Cau Tran, through his attorney, Mr. Paul D. Hogan, filed a motion for severance from defendants Ngan Van Pham and Thanh Van Pham. In his motion Cau Tran alleged:

"1. Evidence in this cause may be introduced by the prosecution which may be inadmissible against this defendant but which may be admissible against one or more of his co-defendants, all to the prejudice of this Defendant.

"2. The jury will have insurmountable difficulty in distinguishing the alleged acts of this Defendant from the alleged acts of his co-defendants.

"3. During the course of the trial, Cau Tran intends to call as a defense witness the co-defendant, Ngan V. Pham, whose testimony would establish his innocence of the crime charged. A joint trial of the defendants in this cause would preclude Cau Tran from presenting all of the facts and circumstances surrounding the incident to the jury in light of the constitutional provisions that would unquestionably be involved by the co-defendant.

"4. The defenses of the defendants in this cause are antagonistic."

Four days later, September 7, 1982, defendant Ngan Van Pham filed a motion for separate trial through his attorney Mr. Phillip Leon. Mr. Ngan Van Pham alleged a trial with his codefendants would deny him due process of law and, further, he intended to call defendant Cau Tran as a defense witness. Finally, according to defendant Ngan Van Pham, denial of a separate trial would deny him the constitutional right to present all facets of his case.

On September 10, 1982, the motions of defendants Cau Tran and Ngan Van Pham were argued before Judge Hal Malone. During oral argument on the motions, Mr. Hogan revealed Mr. Tran would assert he acted in self-defense. Mr. Hogan orally modified his motion for severance arguing it was only necessary his client, Cau Tran, be separated from Ngan Van Pham, but it was satisfactory if he were to be jointly tried with defendant Thanh Van Pham.

Mr. Leon argued a joint trial between the defendants would be prejudicial to his client, Ngan Van Pham, as evidence which would be inadmissible as to Ngan Van Pham would be admissible as to one or more of the codefendants. Mr. Leon never

identified what this evidence would be. The main thrust of Mr. Leon's attempt to have Mr. Ngan Van Pham severed was that his client was going to assert an alibi and wanted to call Mr. Cau Tran to testify Ngan Van Pham was not in the vicinity at the time of the killings. Mr. Leon feared constitutional dictates could preclude him from examining defendant Cau Tran at trial. Mr. Hogan also argued to the court the similarity in the names of the Vietnamese defendants and witnesses would cause great difficulty at trial and confuse the jury to the prejudice of the defendants.

In response to the two motions for severance, Mr. Waller, for the State, brought to the court's attention the crimes alleged were part of a single transaction, and the State's evidence would show all three defendants simultaneously gunned down the two victims, Mr. Den Nguyen and Mr. Phong Vihn Thanh Tran. In other words, the State argued the evidence would show all of the events, all of the evidence, arose out of the same transaction. The State found nothing inherently antagonistic in the self-defense theory of defendant Cau Tran and the alibi defense of Ngan Van Pham.

In denying defendants Cau Tran and Ngan Van Pham's motions for severance, Judge Malone commented:

"THE COURT: Well, there isn't any question but what there is statutory authority for charging all three of the Defendants in the same Information and trying them all together. As Mr. Waller points out, it's one transaction, single transaction. The, I guess, crime makes strange bedfellows the same as politicians—politics makes strange bedfellows. I don't perceive a great deal of difficulty in the similarity of names, at least not enough to sever the trials, and the defenses claimed by the two Defendants are not antagonistic. I conclude the Defendants have failed to state sufficient reasons to sever themselves from the trial. The motion—each motion is overruled."

K.S.A. 22-3202(3) allows two or more defendants to be charged in the same criminal complaint, information or indictment if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting a crime or crimes. Such defendants may be charged in one or more counts together or separately, and all of the defendants need not be charged in each count. (See also Vernon's Kansas C. Crim. Proc. § 22-3202 [1973]; Fed. R. Crim. Proc. 8.) As previously noted, 22-3204 provides when two or more defendants are jointly charged with any crime, the trial court may order a separate trial

for any one of the defendants when requested by such defendant or the prosecuting attorney. (See also Vernon's Kansas C. Crim. Proc. § 22-3204; Fed. R. Crim. Proc. 14.)

Separate trials should be granted under 22-3204 when severance is necessary to avoid prejudice and ensure a fair trial to each defendant. *State v. Myrick & Nelms*, 228 Kan. 406, 415, 616 P.2d 1066 (1980); *State v. McQueen & Hardyway*, 224 Kan. 420, 423, 582 P.2d 251 (1978); *United States v. Frazier*, 394 F.2d 258, 260 (4th Cir.), *cert. denied* 393 U.S. 984 (1968). In *State v. Cameron & Bentley*, 216 Kan. 644, 533 P.2d 1255 (1975), the court declared in order for a separate trial of a joint defendant to be granted the moving defendant, or defendants, must present grounds sufficient to the trial court to establish *actual* prejudice if a joint trial occurred. 216 Kan. at 649. *State v. Jones*, 222 Kan. at 58; *State v. Hensley*, 219 Kan. 826, 828, 549 P.2d 874 (1976); *State v. Sully*, 219 Kan. 222, 224, 547 P.2d 344 (1976).

In *State v. Martin*, 234 Kan. 548, 673 P.2d 104 (1983), the grounds for severance were set forth as follows:

"The usual grounds for severance are: (1) that the defendants have antagonistic defenses; (2) that important evidence in favor of one of the defendants which would be admissible in a separate trial would not be allowed in a joint trial; (3) that evidence incompetent as to one defendant and introducible against another would work prejudicially to the former with the jury; (4) that a confession by one defendant, if introduced and proved, would be calculated to prejudice the jury against the others; and (5) that one of the defendants who could give evidence for the whole or some of the other defendants would become a competent and compellable witness on the separate trials of such other defendants." Syl. ¶ 2.

Severance under 22-3204 lies within the sound discretion of the trial court. *State v. McQueen & Hardyway*, 224 Kan. at 425. Reversal of the lower court's denial of severance is justified only when a clear abuse of discretion is established. *United States v. Ehrlichman*, 546 F.2d 910, 929 (D.C. Cir. 1976), *cert. denied* 429 U.S. 1120 (1977), 39 A.L.R. Fed. 604; *State v. Smith & Miller*, 224 Kan. 662, 672, 585 P.2d 1006 (1978), *modified* 225 Kan. 199, 588 P.2d 953, *cert. denied* 441 U.S. 964, *reh. denied* 444 U.S. 889 (1979). (See also *Smith v. Atkins*, 565 F. Supp. 721, 738 [D. Kan. 1983]). A party claiming abuse of discretion has the burden to establish the claim. *State v. Williams*, 234 Kan. 233, 238, 670 P.2d 1348 (1983); *State v. Wright*, 4 Kan. App. 2d 196, Syl. ¶ 5, 603 P.2d 1034 (1979), *rev. denied* 227 Kan. 928 (1980). The limitations on joinder and provisions for severance are to prevent

manifest injustice. When two or more defendants are charged with multiple crimes some prejudice necessarily will occur. When the evidence of participation and identity of those charged is clear and convincing, prejudice from a joint trial may not be great. *State v. McQueen & Hardyway,* 224 Kan. at 425. However, when the evidence is clear and convincing as to one defendant, but not so as to another, failure to sever may cause prejudice which will result in manifest injustice in violation of constitutional due process. 224 Kan. at 425.

There is a material advantage in having defendants tried together for the crimes in which all have jointly participated during a short period of time. In a joint trial witnesses will have to testify but once. The saving of time and money to the state may be substantial. *State v. McQueen & Hardyway,* 224 Kan. at 425; *United States v. Robinson,* 432 F.2d 1348, 1351 (D.C. Cir. 1970). However, these considerations are secondary to giving each person accused a fair trial under the Constitution. The question of prejudice to multiple defendants should be carefully considered before a severance under 22-3204 is denied. 224 Kan. at 425; *State v. Sully,* 219 Kan. at 224.

What are antagonistic defenses so as to mandate separate trials? A thorough review on this subject appears at Annot., Antagonistic Defenses as Ground for Separate Trials of Codefendants in Criminal Case, 82 A.L.R.3d 245. What emerges from the wealth of cases in this annotation is a mere allegation of antagonistic defenses, such as given here by defendants, is not enough. 82 A.L.R.3d at 256, § 4. See *State v. Smith & Miller,* 224 Kan. at 673. Mere apprehension antagonistic defenses may develop at trial does not warrant severance. 82 A.L.R.3d at 262, § 8. Even if antagonistic defenses are established the defendant must still show prejudice would result from a joint trial. 82 A.L.R.3d at 257, § 5. For example, in *State v. Andrada,* 82 N.M. 543, 484 P.2d 763 (Ct. App.), *cert. denied* 82 N.M. 534 (1971), the New Mexico Court of Appeal declared the fact of conflicting defenses, standing alone, did not amount to a showing the trial court abused its discretion in denying severance. 82 N.M. at 544. Inconsistency of trial strategies is not sufficient to require severance. 82 A.L.R.3d at 264, § 10. Nor, necessarily, does hostility between defendants require severance without more being shown. 82 A.L.R.3d at 263, § 9. Finally, a trial court in considering a motion

to sever should not confuse evidence which is antagonistic to defendants with antagonistic defenses. *E.g., United States v. Frazier,* 394 F.2d at 261.

Before defenses of codefendants will be declared antagonistic there must be a dichotomy, or near dichotomy, between the defenses. The classic example of intrinsically antagonistic defenses is where both defendants blame each other for the crime while attempting to defend against the State's case. *State v. Sully,* 219 Kan. at 225. See also 75 Am. Jur. 2d, Trial § 21. A good example of this situation is *Murray v. State,* 528 P.2d 739 (Okla. Crim. 1974), where one defendant's testimony and confession was such only the codefendant could have committed the crime while the codefendant's testimony and confession was such only the defendant could have committed the offense. In other words, each defendant was attempting to convict the other.

In *United States v. Haldeman,* 559 F.2d 31, (D.C. Cir. 1976), *cert. denied* 431 U.S. 933 (1977), the United States Circuit Court for the District of Columbia held in order to reverse a district court denial of severance:

"[T]he accounts of co-defendants be not merely divergent from one another but indeed 'so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency.' To warrant a severance, in short, the accounts of co-defendants must be 'on a collision course.' *United States v. Bolden,* 169 U.S. App. D.C. 60, 69, 514 F.2d 1301, 1310 (1975)." p. 71.

In *State v. Martin,* 234 Kan. 548, we said:

"The existence of antagonistic defenses among codefendants is cause for severance when the defenses conflict to the point of being irreconcilable and mutually exclusive." Syl. ¶ 3.

Did the district court abuse its discretion in denying the motion for separate trials herein? We believe not.

All three defendants testified they were in the Vietnamese Center at the time the two victims were killed. Cau Tran testified the two victims drew weapons and he shot them to save the life of defendant Thanh Van Pham who was standing with his back to the victims. Cau Tran had no objection to being jointly tried with Thanh Van Pham.

Defendant Ngan Van Pham admitted being at the table with the victims and the codefendants shortly before the shooting, but testified he had left the table but not the room when the killings occurred. Defendant Thanh Van Pham testified he also had been

at the table with the other four on the night in question, but as he walked away he heard his name called. He then turned around, saw the victims pointing guns at him and ran from the scene.

It should be noted Ngan Van Pham's characterization of his defense as being an "alibi" is a misnomer. He admits to being present in the room where and when the killings occurred. He, in essence, is contending he was present but not involved in the homicides. This is not an alibi defense. An alibi places the defendant at the relevant time in a different place than the scene involved and so removed therefrom as to render it impossible for the accused to be the guilty party. *Com. v. Van Wright,* 249 Pa. Super. 451, 457, 378 A.2d 382 (1977); *Commonwealth v. Warrington,* 230 Pa. Super. 332, 334, 326 A.2d 427 (1974); Black's Law Dictionary 66 (5th ed. 1979).

Applying the previously cited grounds for and rules relative to severance of trials to the facts herein, it is abundantly clear the district court did not abuse its discretion in denying the motion for separate trials on any of the alleged grounds. The possible confusion of defendants' names by the jury would not be lessened in separate trials and in some ways could be increased by separate trials. There is no showing of any antagonistic defenses. Further, each defendant had full opportunity to cross-examine each codefendant and there is no showing of actual prejudice resulting from the joint trial. We conclude this issue is wholly without merit.

The second issue is whether the trial court erred in overruling the objections of defendant Ngan Van Pham and Cau Tran to the court interpreter's translations. This issue encompasses the following questions:

(a) Was it error for the trial court not to have removed the court interpreter upon defendants' contention she was incompetent in her translations?

(b) Was it error for the trial court not to have permitted defendant Cau Tran to be examined through and testify through his personal interpreter, rather than the court's interpreter?

(c) Was it error for the trial court not to permit defendant Ngan Van Pham to challenge the competency of the court interpreter in the presence of the jury?

As many of the witnesses, and all defendants, were Vietnam-

ese, the trial court determined it was necessary the proceedings be interpreted for the benefit of all concerned. Instead of one interpreter the trial court appointed an interpreter for the court and one for each defendant. The court's interpreter was a Vietnamese woman named Ms. Van Pham (no relation to any of the parties); defendant Cau Tran's interpreter was an American, Mr. James Klassen, who had spent approximately thirty-nine months in Vietnam ten years before. Defendant Ngan Van Pham's interpreter was Mr. Linh Nguyen; defendant Thanh Van Pham's was Ms. Lan Nguyen.

Immediately before trial Judge Hodge asked each defendant whether he had any objections to any of the court-appointed interpreters. Mr. Hogan, representing defendant Cau Tran, said he had no challenge. Mr. Leon and Mr. Green, representing defendants Ngan Van Pham and Thanh Van Pham respectively, asserted they were reserving their right to challenge the court's interpreter. The trial court was not satisfied with this response and indicated if the two defendants had any objection to the court's interpreter they were to voice them then. The competency of an interpreter should be determined prior to the time he or she discharges his or her duties. 21 C.J.S., Courts § 141b. As a result of the reluctance exhibited by Messrs. Leon and Green, the trial judge ordered Ms. Van Pham to take the stand and be examined by all the attorneys to determine her qualifications as an interpreter. First to examine Ms. Pham was Mr. Waller, prosecuting attorney. His inquiry was as follows:

"BY MR. WALLER:

"Q. Would you please state your name and age for the Court?

. . . .

"A. Okay. My name is Van Pham. First name V-A-N; last name P-H-A-M. I am twenty years old.

"Q. And where was your place of birth?

"A. Okay, I was born in Vietnam.

"Q. What part of Vietnam?

"A. In Saigon in South Vietnam.

"Q. And might I ask you, are you acquainted with the Vietnamese language?

"A. Yes, I do.

"Q. What education did you receive in Vietnam?

"A. Well I was in sixth grade in Vietnam, and when I got to America I was in seven grade. And I graduated from high school. I went to college for one year, and then I was a teacher now at the Catholic Charity Church

helping the refugee and at night time I go to school in Bryan Institute taking programmer.

"Q. I see. And when did you come to the United States?

"A. I was in — it was in 1975 in July.

"Q. You indicated to us you're presently a teacher at the Catholic Social Services—

"A. Yes.

"Q. — Refugee Program.

"A. Yes.

"Q. And what do you do there, ma'am?

"A. I am a teacher. I teach English for the refugee.

"Q. And how long have you done this?

"A. For one year.

"Q. And as a teacher, are you responsible for speaking in Vietnamese with your various students?

"A. Well, actually we speak English most of the time, but if the student don't understand, then we translate into Vietnamese.

"Q. Now you indicated you are familiar with the Vietnamese language, is that broken down into dialects?

"A. Well, I was in Vietnam for thirteen years, and so that's the — I speak Vietnamese and some kind of that, but I'm not sure that I know all because I would be there for thirteen years. But we keep speaking English — I mean we keep speaking Vietnamese most of the time at home.

"Q. I see. Are you acquainted with any of the Vietnamese community here in the City of Wichita?

"A. Yes.

"Q. And do you associate with the Vietnamese community here in the City of Wichita?

"A. Yes.

"Q. Do you communicate with them in Vietnamese?

"A. Yes.

"Q. Have you ever had any difficulty understanding another Vietnamese person?

"A. No, un-huh."

Mr. Green, for defendant Thanh Van Pham, asked Ms. Van Pham about the high school from which she graduated (Wichita Heights), the college she attended for a year (Kansas State University), and the courses she took there (business). Mr. Leon, for defendant Ngan Van Pham, asked Ms. Pham about the various dialects in the Vietnamese language and whether she could understand Vietnamese spoken by a person who came from North rather than South Vietnam. Ms. Pham said she could do so because her parents had come from the north. The court asked each defendant to identify in which part of Vietnam they had lived. Each defendant said they were from the south, the same as Ms. Pham. Ms. Van Pham, being aware of where all

defendants came from in Vietnam, informed the court she would have no trouble interpreting. Mr. Hogan, attorney for defendant Cau Tran, did not ask Ms. Van Pham any questions.

In reliance upon, and in conformity with, K.S.A. 75-4353, Judge Hodge found Ms. Van Pham, as the court's interpreter, was not interested in the outcome of the trial, was able readily to communicate with a person whose primary language was one other than English, and was able accurately to translate and repeat statements of persons from Vietnamese into English and English into Vietnamese. Judge Hodge then advised how allegations of misinterpretation were to be handled at trial.

"I am going to issue an order that in the event any of your interpreters disagree either among yourselves or disagree with what the Court's interpreter interprets the testimony of any Vietnamese witness, then no counsel is to stand up and relate that fact to the jury. What I want to happen is the attorney can make objection — we'll stop the proceeding — to approach the bar and advise me in a voice that cannot be overheard by the jury that we have a dispute over what is said by one of the witnesses. At that time I will excuse the jury to go back to the jury room and we will get to the bottom of it.

"If there is an error in any translation, I'm also going to tape record the testimony given by the Vietnamese. That testimony will not be preserved, please understand, on the tape recording. It will merely be preserved for short durations at a time being the time limit on each side of the tape cassettes. The reason for that being that if there is a disagreement on what a Vietnamese witness testified to, including the defendants, then I would have the actual recording of what was said so that it could be played back. Obviously my Court Reporter can't take down Vietnamese or at least I don't think she's that talented; she's quite talented, but I don't think she's reached that stage yet. And in this way it would preserve that testimony so that should a conflict arise as to the proper translation it could be played back until we could arrive at what the proper translation was."

No attorney objected to this procedure of challenges to the accuracy of translations being outside the hearing of the jury. After the trial judge announced this procedure he accepted recommendations from Mr. Hogan, attorney for defendant Cau Tran, that Ms. Van Pham translate in the first person (the usual procedure according to 98 C.J.S., Witnesses § 326), and that if during trial the interpreter did not understand a question or answer, or the attorneys and witnesses spoke too fast, she should inform the court so a correct translation could be assured. Finally, Mr. Leon, for defendant Ngan Van Pham, elicited from Ms. Van Pham she was acquainted with the court system of the defunct Republic of Vietnam and the court system of the United

States, and she could explain the differences if a situation arose at trial.

K.S.A. 60-243(*e*), promulgated by order of the Kansas Supreme Court in 1969, permits a court to appoint an interpreter of its own selection (see 1 Gard's Kansas C. Civ. Proc., 2d Annot. § 60-243[*e*] [1979], comments, p. 259; Vernon's Kansas C. Civ. Proc. § 60-243[e] [1983 Supp.]). K.S.A. 60-417 provides an interpreter is subject to all the provisions of the Kansas Code of Civil Procedure relating to witnesses, 60-417 through -422. In other words, a person may not be an interpreter if he or she is incapable of expressing themselves, 60-417(*a*), or is incapable of understanding the duty to tell the truth, 60-417(*b*), *i.e.*, to interpret correctly. 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-417 (1979), comments, p. 102. Like any witness, an interpreter must take an oath or affirmation before testifying, 60-418 (see also K.S.A. 75-4354), and as a prerequisite to testifying demonstrate his or her experience, training, or education. K.S.A. 60-419. While such evidence may not be in the form of an ex parte affidavit from the interpreter, *Railway Co. v. Bagley,* 60 Kan. 424, 435, 56 Pac. 759 (1899), it may be testimony from the interpreter, 60-419, subject to cross-examination. 60 Kan. at 435. The credibility of the interpreter may not be brought into question by a conviction unless the crime involved dishonesty or false statement. K.S.A. 60-421. Similarly, evidence of character traits of an interpreter, other than honesty or veracity or their opposites, are inadmissible. K.S.A. 60-422(*c*).

K.S.A. 75-4351 *et seq.*, is an act providing for the appointment of qualified interpreters for persons whose primary language is one other than English, or who are deaf or mute or both, in certain court proceedings and proceedings before certain boards, commissions and agencies of the state and political subdivisions. L. 1973, ch. 364. K.S.A. 75-4351 directs a qualified interpreter shall be appointed for a person whose primary language is one other than English in any court proceeding involving such person where such proceeding may result in the confinement of such person or the imposition of a penal sanction against such person. K.S.A. 75-4351(*b*). K.S.A. 1982 Supp. 75-4352 specifies all interpreters shall be appointed by the judge. See also 60-243(*e*). In delineating who is and is not competent to be an interpreter, 75-4353(*a*) declares no one shall be appointed to serve as an interpreter for a person if he or she is married to that

person, related to that person within the first or second degrees of consanguinity, living with that person or is otherwise interested in the outcome of the proceeding. A trial judge may appoint an interpreter who is married to, related to, or living with the person, or even if the interpreter has an interest in the outcome of the proceeding, if the court determines there is no other qualified interpreter available. K.S.A. 75-4353(*a*). *E.g., Lujan v. United States,* 209 F.2d 190, 192 (10th Cir. 1953). See also *State v. Rangel,* 169 Kan. 194, 197, 217 P.2d 1063 (1950), where the trial court used an interpreter who had been employed by the State during the investigation of the case; and *People v. Murphy,* 276 Ill. 304, 320, 114 N.E. 609 (1916), where it was held the fact the interpreter was a city police officer did not disqualify him.

To qualify an interpreter the trial court must make a preliminary determination the interpreter is able readily to communicate with the person whose primary language is one other than English and is able accurately to repeat and translate the statement of said person. 75-4353(*b*); see also 60-419. In other words, the trial court must be satisfied the interpreter will be a ready and accurate medium between the court and the witness. Finally, 75-4354 requires any interpreter appointed by the court to take an oath he or she will make a true interpretation in an understandable manner to the person for whom he or she is appointed,and he or she will repeat the statements of such person in the English language to the best of his or her skill and judgment. See also 60-418.

The importance of an interpreter to judicial proceedings has long been recognized in American jurisprudence. In *Schnier v. People,* 23 Ill. 17 (1859), the Illinois Supreme Court observed:

"When the facts, conversations or admissions, admissible in evidence, are known to a person who does not understand and speak the language in which the trial is conducted, then the only means by which the jury or court trying the issue can arrive at the facts, is from the evidence through an interpreter who understands and speaks both languages. And when he is so employed, it is his duty to translate the evidence given by the witness into equivalent terms of the language employed by the tribunal trying the cause. All persons are aware of the fact, that the power to make a literal translation from one language to another, so as to preserve in the translation the precise meaning of the original, depends upon an accurate knowledge of both languages by the translator. 23 Ill. at 27.

See Annot., Admissibility of Testimony Concerning Extrajudi-

cial Statements Made to, or in Presence of, Witness Through an Interpreter, 12 A.L.R. 4th 1016; Annot., Disqualification, for Bias, of One Offered as Interpreter of Testimony, 6 A.L.R. 4th 158; Annot., Right of Accused to Have Evidence or Court Proceedings Interpreted, 36 A.L.R.3d 276; Annot., Use of Interpreter in Court Proceedings, 172 A.L.R. 923; Annot., Right of Accused to Have Evidence Interpreted to Him, 140 A.L.R. 766.

The determination and propriety of appointing a person as an interpreter lies within the discretion of the trial court. K.S.A. 60-243(e); 2 Wright, Federal Practice and Procedure: Crim. 2d § 456 (1982); 9 Wright & Miller, Federal Practice and Procedure: Civil § 2417 (1971); 75 Am. Jur. 2d, Trial § 58, p. 170; 21 C.J.S., Courts § 141b; *Lujan v. United States*, 209 F.2d at 192; *Casciato v. Rennick*, 380 P.2d 122, 123 (Wyo. 1963). As trial courts are accorded wide discretion in determining the fitness of a person called to serve as an interpreter, *Lujan v. United States*, 209 F.2d at 192, such a determination will be reversed on appeal only in the most *extreme* circumstances. 2 Wright, Federal Practice and Procedure: Crim. 2d § 456. See also 21 C.J.S., Courts § 141b.

While a person who is engaged in discharging the duties of an interpreter is a witness, 98 C.J.S., Witnesses § 326; K.S.A. 60-417; *People v. De Larco*, 142 Cal. App. 3d 294, 306, 190 Cal. Rptr. 757 (1983), and may even be regarded as acting in the capacity of an expert, *Railway Co. v. Bagley*, 60 Kan. at 435, he or she is more than a mere witness. Though in a sense he or she is an officer of the court, an interpreter is best described not as a court officer but merely an attendant. 21 C.J.S., Courts § 141a.

It is not error for a court to appoint more than one interpreter. *Skaggs v. State*, 108 Ind. 53, 57, 8 N.E. 695 (1886). In *State v. Rangel*, 169 Kan. 194, the trial court, as in the instant action, authorized multiple interpreters; one for the court and one for the defendant. 169 Kan. at 197. Similar occurrences may be observed in *People v. Mendes*, 35 Cal. 2d 537, 543, 219 P.2d 1 (1950); *State v. Masato Karumai*, 101 Utah 592, 596-99, 126 P.2d 1047 (1942); and *Lujan v. United States*, 209 F.2d at 192. A common test on appellate review of whether a trial court erred in declining to appoint an interpreter is whether or not such failure hampered the defendant in any manner in presenting his case fairly to the jury. *Viliborghi v. State of Arizona*, 45 Ariz. 275, 283,

42 P.2d 210 (1935). See also *Beall v. Spear,* 106 Kan. 690, 692-93, 189 Pac. 938 (1920).

There is a rebuttable presumption an interpreter in the performance of his official duty has acted regularly. *People v. De Larco,* 142 Cal. App. 3d at 307. Merely because an interpreter has had some problems in translating is not sufficient to rebut this presumption. 142 Cal. App. 3d at 307. Courts have recognized, as is all too evident from this case, that words in one language may not have an exact companion in another language and it is therefore impossible in certain circumstances for an interpreter to convey the precise language of the witness to the court. In *Seniuta v. Seniuta,* 31 Ill. App. 3d 408, 334 N.E.2d 261 (1975), the Illinois Court of Appeals declared an interpreter's account of the answers of a witness need not be literal as long as the answers of the interpreter and the witness amounted to the same thing. 31 Ill. App. 3d at 417. Indeed, there are situations in which the interpreter may testify to the sense in which he or she understood the witness. 31 Ill. App. 3d at 417. See also *United States v. Guerra,* 334 F.2d 138, 142-43 (2d Cir.), *cert. denied* 379 U.S. 936 (1964). The California Supreme Court in *People v. Jackson,* 53 Cal. 2d 89, 346 P.2d 389 (1959), found no error where an interpreter employed an irregular technique in answering in the third person, and in some instances editing, explaining or interpolating the questions and answers. 53 Cal. 2d at 95. No substantial deviation was observed between the interpreter's answers and other testimony in the case. 53 Cal. 2d at 95. In *People v. Murphy,* 276 Ill. 304, two defendants were charged with murder. At trial a Greek witness testified. Through an interpreter the witness was asked who had held the gun at the killing. The witness answered "Megalos" which, in Greek, meant the big man. The interpreter reported the answer to mean defendant Murphy. In like manner the witness when asked about the other party to the killing said "Mikros"—the little man; which the interpreter represented to the court meant defendant Armstrong. In rejecting defendant Murphy's appeal on the translation, the Illinois Supreme Court held while the interpretations were not literal, the answers of the interpreter and the witness amounted to one and the same thing and the evidence clearly showed defendant was the big man (Megalos), while defendant Armstrong was the little man (Mikros). 276 Ill. at 320-21.

K.S.A. 75-4354 does not impose an absolute requirement on an interpreter to give a literal translation. Rather, the interpreter's translation must be to the best of his skill and judgment.

While a party may challenge the competency of an interpreter, only the trial judge may remove an interpreter. 2 Wright, Federal Practice and Procedure: Crim. 2d § 456, p. 634. In other words, the competency of an interpreter is for the trial court to determine, *People v. Mendes*, 35 Cal. 2d at 543. Further, it is for the court to determine whether a challenge to an interpreter's competency at trial has been justified. *People v. De Larco*, 142 Cal. App. 3d at 306.

Defendants Ngan Van Pham and Cau Tran objected to a number of the court interpreter's translations. In each instance the trial court followed the procedure it had previously outlined for the handling of such objections (the same being set forth earlier in this opinion). We have carefully reviewed the record and find no abuse of discretion relative to the trial court's handling of these objections or in failing to remove the court interpreter for alleged incompetence.

Cau Tran requested the interpreter appointed for him personally be permitted to serve as the court interpreter during his own testimony. The trial court refused the request and said defendant contends this was error. Basically Cau Tran claims his interpreter, being American born, was more conversant in English than was the court interpreter. In denying the request the court noted it already had a qualified interpreter and Cau Tran had not objected to her appointment. (As will be recalled, Cau Tran's attorney did not ask the court interpreter any questions on her qualifications after having been afforded an opportunity to do so.) The court also expressed the belief that for Cau Tran's interpreter to serve in dual capacities at the same time would be "approaching conflict of interest in the greatest degree." See Annot., 6 A.L.R. 4th 158. The court further noted:

"THE COURT: Mr. Hogan [Cau Tran's attorney], when you have been discussing the case with your client, he has made a bona fide interpretation for an attorney of confidential nature. And for him to now be appointed the Court's interpreter would be twofold. First, it would take him away from the defendant. I cannot appoint him as a court interpreter and then allow him to go back to the defendant. It would then throw discredit upon the present Court's interpreter because the jury would see immediately that she was not there and that all of a sudden the defendant's interpreter was there which would put greater reliance

upon the defendant's interpreter. It's an irreconcilable conflict that the objection of the State must be sustained."

We find no abuse of discretion in the trial court's refusal to permit Cau Tran's interpreter to serve as the court interpreter during Cau Tran's own testimony.

We turn to the question of whether the trial court erred in refusing to permit defendant Ngan Van Pham to challenge, *in the presence of the jury,* the competency of the court interpreter.

Prior to commencement of the trial the court announced the procedure for handling objections to the court interpreter's translation of the testimony. This procedure is set forth earlier in the opinion and will not be repeated. Basically it involved handling all such objections outside the presence of the jury. None of the defendants objected to this procedure when it was announced and cannot now be heard to complain. However, if a proper objection had been timely made, we see no error or abuse of discretion in the procedure utilized. To have the jury hear various interpretations involving fine shadings of meanings of the same word or phrase and then have the court, as it did here, accept the official interpretation could certainly confuse a jury.

We find all questions raised within this issue to be without merit. Additionally, we believe the trial court is to be complimented on its handling of the difficult interpreter situation in this case.

The third issue is whether, as to defendant Thanh Van Pham, the trial court erred in instructing on "aiding and abetting."

Instruction No. 33 was as follows:

"You are instructed that under the law of the State of Kansas anyone who intentionally counsels, aids, abets or assists another or others in the commission of any crime(s), either by conspiring, counseling, advising, or assisting in any matter in the preparation or completion, is equally guilty with the one(s) actually committing the crime(s) without regard to the extent of their participation.

"You are, therefore, instructed in this case that if you find beyond a reasonable doubt that any defendant(s) intentionally conspired, counseled, aided, abetted, advised or in any manner assisted others in the preparation or commission of the crime(s) charged in the information as elsewhere defined in these instructions, then that defendant(s) individually is guilty of such crime(s) as though he, by himself, without assistance, committed that crime(s)."

In *State v. Payton,* 229 Kan. 106, Syl. ¶ 2, 622 P.2d 651 (1981), this court recognized any person who counseled, aided or abetted in the commission of any offense could be charged, tried,

convicted and punished in the same manner as if he or she were a principal. A few years before, in *State v. Schriner*, 215 Kan. 86, Syl. ¶ 6, 523 P.2d 703 (1974), the court observed "[t]o be guilty of aiding and abetting in the commission of a crime the defendant must wilfully and knowingly associate himself with the unlawful venture and wilfully participate in it as he would in something he wishes to bring about or to make succeed." *State v. Turner*, 193 Kan. 189, 392 P.2d 863 (1964), announced all participants in a crime were equally guilty, regardless of the extent of their participation. 193 Kan. at 196. Consequently, if in the execution of a common purpose, one of the participants did the killing, the others would be guilty of murder as well. 193 Kan. at 196. Liability for crimes of another is set forth in K.S.A. 21-3205.

The challenge to the instruction herein is not that it inaccurately states the law, but rather it should not have been given as to this defendant.

Thanh Van Pham objected to the aiding and abetting instruction. On appeal Thanh Van Pham argues there was no evidence in the case he aided, abetted, or assisted in the shooting of the victims. The essence of defendant's argument is if he had any culpability in the murders it was as a principal, not as an aider and abettor and, according to defendant, the jury did not convict him as a principal but rather as an aider and abettor. In support of this contention, defendant Thanh Van Pham relies upon a question sent by the jury to the court during deliberations in which the jury asked if a person had any involvement at all in a crime would he have to be charged with the same degree of offense as the person who the evidence showed to be guilty of the crime. Defendant Thanh Van Pham asserts this inquiry related to him and revealed confusion on the part of the jury. The jury question form does not indicate which defendant it had in mind.

The State adequately summarizes the evidence relative to this issue in its brief as follows:

"The defendant's complaint is that [Instruction 33] may have permitted him to be convicted as an aider and abettor; the defendant alleges that if he is guilty at all, he can only be guilty as a principal. The Appellee notes that the defendant's premise that he can only be a principal as to both murders is erroneous.

"True enough, the defendant's conviction must rest in part upon his identification as one of the three men who shot handguns at these two victims. However, the use of the firearm does not necessarily make him a principal in the *death* of both victims. Three handguns were positively identified as having been used

in the shooting: a .22 caliber revolver and two .38 caliber revolvers. The co-defendant Cau admitted that he had used only the .22 caliber revolver . . . . As neither Ngan nor Thanh admitted the use of the .38 caliber weapons, we must look to circumstantial evidence to see which weapon Thanh had used. Thanh's fingerprints [were] identified on the Smith & Wesson .38 revolver and on no other weapon . . . . In viewing the evidence in a light most favorable to the State, we might then find Thanh used the Smith & Wesson .38 caliber revolver. The bullet removed from Phong was identified as having come from that weapon by a firearms identification expert, and only one of the four bullets removed from Den's body (not necessarily the bullet causing the death) was identified as having come from the same weapon . . . . Therefore, Thanh would be a principal in the death of Phong because the sole fatal wound came from the .38 revolver connected to Thanh by fingerprint comparisons; however, Thanh would be an aider or abettor to the co-defendant principal who fired the fatal bullet into Den. Although the pathologist was able to distinguish wounds which were capable of producing death independently, he failed to identify any bullet or bullets as the one bullet or combination of bullets that actually caused the death of Den. Furthermore, as all three defendants admitted handling the weapons at Ngan's girlfriend's house where they hid the weapons, the jury could have chosen to believe that Thanh put his fingerprint on the .38 Smith & Wesson at that time, and that he had actually fired the other .38 caliber weapon. None of the bullets removed from either body were positively identified as having come from this second .38 caliber revolver, although bullets found at the crime scene could be positively matched to such weapon. If the jury chose to believe Thanh used this .38 Arminius revolver, he would be an aider or abettor as to both homicides, although a principal as to any shooting of the firearm. But Thanh was not charged with merely shooting at these victims; he was charged for his participation in the murder of these victims."

Additionally, the State's evidence showed there was a history of hostility between the three defendants and the two victims. Immediately prior to going to the Vietnamese Center on the night of the murders, the three defendants had a meeting relative to resolving their problems with the victims. The jury could easily have surmised the three defendants were acting in concert according to a jointly agreed-upon plan when they shot the victims.

We conclude the trial court did not err in giving the aiding and abetting instruction.

The final issue is whether, as to defendants Thanh Van Pham and Cau Tran there is sufficient evidence to sustain their first-degree murder convictions.

In a criminal action where defendants contend the evidence at trial was insufficient to support their convictions, the standard of appellate review is: Does the evidence, when viewed in the light most favorable to the prosecution, convince the appellate

court a rational factfinder could have found defendants guilty beyond a reasonable doubt? *State v. Royal,* 234 Kan. 218, 225, 670 P.2d 1337 (1983); *State v. Walter,* 234 Kan. 78, 82, 670 P.2d 1354 (1983); *State v. Williams,* 234 Kan. 233, 239, 670 P.2d 1348 (1983); *State v. Coberly,* 233 Kan. 100, 103, 661 P.2d 383 (1983); *State v. Rodriquez,* 8 Kan. App. 2d 353, 357, 657 P.2d 79, *rev. denied* 233 Kan. 1093 (1983); *State v. Hutton,* 232 Kan. 545, 549-50, 657 P.2d 567 (1983); *State v. Myrick & Nelms,* 228 Kan. 406, 421, 616 P.2d 1066 (1980); *State v. Acheson,* 3 Kan. App. 2d 705, 710, 601 P.2d 375, *rev. denied* 227 Kan. 927 (1979); *State v. McGhee,* 226 Kan. 698, 700-01, 602 P.2d 1339 (1979); *State v. Voiles,* 226 Kan. 469, 472-73, 601 P.2d 1121 (1979); *Jackson v. Virginia,* 443 U.S. 307, 318-19, 61 L.Ed.2d 560, 99 S.Ct. 2781, *reh. denied* 444 U.S. 890 (1979). Moreover, appellate courts look only to the evidence in favor of the verdict, they do not weigh the evidence; and if the essential elements of the charge are sustained by any competent evidence, the conviction stands. *State v. Smolin,* 221 Kan. 149, Syl. ¶ 6, 557 P.2d 1241 (1976); *State v. Acheson,* 3 Kan. App. 2d at 710; *State v. Douglas,* 230 Kan. 744, Syl. ¶ 3, 640 P.2d 1259 (1982); *State v. Rodriquez,* 8 Kan. App. 2d at 357. A conviction of even the gravest offense may be sustained by circumstantial evidence. *State v. Ward,* 233 Kan. 144, 145, 660 P.2d 957 (1983).

The evidence of defendants' guilt in this case, judged by any standard, is overwhelming. No attempt will be made to list all the evidence supporting the convictions, but the following summary touches on some of the highlights. Defendants and the victims were members of rival factions in the Vietnamese community in Wichita. Threats had been exchanged between the defendants and the victims in the 48 hours before the killings. A few hours before the homicides, the three defendants met and conferred. The defendants stated the purpose of the meeting was to plan how to settle amicably their differences with the victims. From the totality of the circumstances, the jury could have reasonably inferred that defendants actually planned a final solution to the hostilities. Shortly after the meeting, the three defendants went to the Vietnamese Center together. After looking around the area briefly, the defendants joined the victims who were seated at a table. After a few moments of visiting, the eyewitnesses testified all three defendants arose from their

chairs, pulled guns, and fired 15 to 17 bullets into the victims in what amounted to an execution. The defendants quickly left the building by separate exits and left the scene in one automobile. Defendants then went to the girl friend's residence where they hid the three guns used in the killings. The pathologist corroborated the fact the victims were seated when shot—further weakening the already extremely thin claim by defendants Cau Tran and Thanh Van Pham that the victims were standing up with guns drawn when the killings occurred. Ballistic tests further corroborated the State's case.

We find this issue to be utterly without merit.

The judgment is affirmed.