No. 84,460

STATE OF KANSAS, *Appellee*, v. RAYMOND E. WALKER, *Appellant*.

(26 P.3d 645)

Opinion filed July 13, 2001.

*Cory D. Riddle*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Boyd K. Isherwood*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Raymond E. Walker appeals his jury convictions of aggravated battery-intentional bodily harm, K.S.A. 21-3414(a)(1)(B), and criminal threat, K.S.A. 21-3419(a)(1). The case was transferred from the Court of Appeals pursuant to K.S.A. 21-3018(c). Walker raises the following issues on appeal: (1) Should the trial court have granted defendant's request for a separate trial, (2) did the trial court abuse its discretion in allowing the jury to take notes during trial and to submit questions to the witnesses, (3) was there sufficient evidence to support defendant's conviction of criminal threat?

At approximately 10 a.m. on March 10, 1999, T.R.M. received medical treatment at Via Christi Regional Medical Center in Wichita for a broken rib, bruises and abrasions over her face and body, and discoloration and swelling around her anus. T.R.M. had been beaten and sexually assaulted by Lavan Randle and defendant, Raymond Walker.

Randle and Walker are half-brothers. Randle and T.R.M. had been involved in a serious romantic relationship until approximately mid-February 1999, when they had broken up. During the evening of March 9, 1999, Randle went to T.R.M.'s workplace, and she called him later that night and invited him to come over in the morning. At approximately 5 a.m. on March 10, Randle used the key he still had to let himself into T.R.M.'s house. Randle woke her up, and they talked in her bedroom. They talked about his seeing another woman and about T.R.M.'s having sex with defendant. She had told Randle that she had sex with defendant three times. T.R.M. and Randle had sex, talked about getting back together, and agreed to put their sexual activities with others behind them and go on.

When Randle was ready to leave, his car would not start. He paged his step-brother, Ervin Garnes, at approximately 6:30 a.m. Garnes called Randle approximately 15 minutes later and then went to T.R.M.'s house to help. He and Randle were not able to get the car started. Randle then called defendant. T.R.M. estimated that defendant arrived at her house at approximately 8 a.m. to help Randle start his car.

At trial, T.R.M. gave the following testimony about what happened when defendant arrived: After she opened the door for him, he immediately punched her twice in the head and demanded that she tell Randle how many times she had had sex with him, and that she had been seeing him all the time Randle thought he and T.R.M. were a couple. T.R.M. insisted that she already had told Randle, and Randle asked, "[H]ow many times?" Defendant began hitting T.R.M. in the face with his fist, and then Randle hit her body with his hand. T.R.M. curled up into a ball to protect her face. Defendant got a broom and put the broom handle in T.R.M.'s vagina, and Randle grabbed the broom handle. Defendant also beat her with the broom and hit her on the buttocks with a frying pan. T.R.M.'s ribs were broken when she was "socked" in the ribs. Because of things defendant said, T.R.M. thought she was going to die when he laid trash bags on the floor. T.R.M. was afraid of defendant because he acted "crazy angry," and she had not seen him like that before. Although she never saw a gun that day, she

thought that defendant had one because he kept reaching toward the pouch of his pullover jacket. Defendant and Randle left her house at approximately the same time, and then Randle returned and gave her some money.

Before being taken to the hospital, T.R.M. talked to police. Officer Berry testified that T.R.M. was visibly injured and was very uncomfortable sitting or standing. T.R.M. told police that defendant was not angry when he arrived at her house, but grew angry after talking to T.R.M. and Randle and learning that they were considering resuming their relationship. She told police that defendant held her down on a bed while Randle pushed the broom handle into her vagina. She said that both men threatened to kill her if she went to the police. She said that defendant heated the frying pan before hitting her with it, and that Randle jumped up and down on her. T.R.M. also told police that in an earlier incident Randle had choked her until a blood vessel in her eye broke.

In T.R.M.'s house, police found a broom, a frying pan, and three black trash bags on the floor. There were broom bristles scattered around the house.

At the hospital, T.R.M. told the examining nurse that Randle and defendant beat her up. She said that defendant left and Randle continued to hit her. She said that Randle called her a "nasty bitch," made her perform oral sex, said she would always be his and that she would die if she called anyone. She also said that Randle told her, "[Y]ou better quit playing on me." T.R.M. denied any consensual sex in the previous 72 hours and denied any attempted penetration of her rectum during the incident.

On March 11, the day after T.R.M. had been injured, she again talked to police. She said that she did not open the door for defendant when he arrived. She said that Randle got the trash bags and beat her and jumped up and down on her chest and kicked her in the ribs. She said that when defendant left the house she tried to go after him, but Randle stopped her from leaving. She said that Randle told her she would obey him, she would have sex with people he was going to bring over, and he was going to have his name tattooed on her. She said that after defendant left, Randle tried to force her to perform oral sex and that he forced her to

bend over the couch to have sexual intercourse. She said that after defendant left, Randle masturbated in front of her and ejaculated on her stomach. She said that in her previous relationships with Randle and defendant, Randle had choked her on one occasion but defendant was never physically violent with her.

In late June 1999, an investigator for the Board of Indigents' Defense interviewed T.R.M. At that time, T.R.M. denied that Randle ever abused her in any way. T.R.M. told the investigator that defendant was "completely out of control, he was either high on something or drunk, but I truly genuinely thought I was going to die, I feared for my life." T.R.M. said that more than once defendant said to her, "You're going to die, you fuckin' bitch. Nobody will give a shit if you live or die," and repeatedly referred to her as a "fuckin' bitch" and told her "he's going to fuckin' kill her, he's going to fuckin' shoot her," and T.R.M. stated that she really thought that she was going to die. T.R.M. told the investigator that she knew defendant often carried a gun and she thought he was reaching for it as he was screaming and threatening her. She said that things she told police right after the incident were not true. She said that she had been upset and angry with Randle at that time because he failed to help her when she needed his help.

The electrician whom Randle was working for on March 10, 1999, testified that Randle did not show up for work until quite late, 9:30 or 10 a.m. Randle arrived in his car. He complained of injuries to his right hand and foot. The electrician examined Randle's swollen hand and foot, decided Randle could not work, and sent him home.

Melissa Mesa, who shared an apartment with defendant, testified at trial that she heard him stirring around earlier and then first saw him at approximately 7:30 a.m. on March 10, 1999. Before lunchtime, defendant asked her if she would make lunch and she did. He drove her to work that evening. Mesa admitted that in her first interview with police, she said that defendant picked her up from work on March 9 and then she did not see him again for a week.

Officer Trollope testified that defendant told him he went to T.R.M.'s residence at approximately 7 a.m. on March 10, 1999. Defendant was arrested on March 12.

Walker first argues that the trial court should have granted his request for a separate trial. K.S.A. 22-3204 provides: "When two or more defendants are jointly charged with any crime, the court may order a separate trial for any one defendant when requested by such defendant or by the prosecuting attorney." In the present case, Raymond Walker and Lavan Randle were jointly charged in a 5-count complaint/information. Both Walker and Randle were named in Counts 1 through 3 with aggravated battery, criminal threat, and rape. Lavan Randle was charged in Counts 4 and 5 with aggravated criminal sodomy and rape. The State dismissed Counts 4 and 5 before trial. The jury acquitted both of them of the rape.

Before trial, the district court granted Randle's request for permission to present evidence of defendant's prior involvement in domestic violence, his general propensity for violence, his practice of carrying a gun, and a particular incident in which defendant shot someone in the face. Randle wanted to introduce the evidence for the purpose of establishing as his defense that defendant compelled Randle to participate in the attack on T.R.M. and that Randle participated out of a well-founded fear of defendant. Defendant's attorney objected to Randle's request, and when the trial court granted it, defendant's attorney asked that defendant be granted a separate trial. Defendant's attorney argued that the evidence of his violence was relevant only to Randle's compulsion defense and, thus, would not be admissible in a separate trial against Walker. Randle's counsel concurred in Walker's attorney's statement that she had been unaware until that hearing of the contemplated compulsion defense, and Randle's counsel had no objection to severance. The trial court overruled the motion to sever.

Neither defendant nor Randle testified at trial. Thus, Randle's compulsion defense was never aired. The objection to the joint trial was renewed by defendant's attorney at the close of evidence.

On appeal, defendant argues that he was prejudiced by the trial court's refusal to grant separate trials because the threat that Randle would introduce the compulsion defense prevented him from testifying. Walker fails to explain, and we do not understand why

Randle's contemplated defense would affect defendant's decision whether to testify.

Defendant also contends that his defense was antagonistic to Randle's defense. He seems to be saying that his alibi defense was inconsistent with Randle's contemplated compulsion defense. There was no evidence at trial, however, that Randle participated in the attack on T.R.M. on account of his fear of defendant. Nor, for that matter, was there effective alibi evidence for defendant. His only witness, Mesa, did not account for defendant's whereabouts between 7:30 a.m. and shortly before lunchtime on March 10, 1999. Thus, Mesa's testimony did not rule out the possibility that defendant was at T.R.M.'s house after 7:30 a.m. Randle's only witness placed Randle at T.R.M.'s house at approximately 7 a.m. that day, with no mention of defendant.

"Severance under K.S.A. 22-3204 lies within the sound discretion of the trial court. Reversal of the lower court's denial of severance is justified only when a clear abuse of discretion is established." *State v. Pham*, 234 Kan. 649, Syl. ¶ 4, 675 P.2d 848 (1984). No abuse of discretion has been shown in the circumstances of the present case.

Walker next argues that the trial court abused its discretion in allowing the jury to take notes during trial and to submit questions to the witnesses. It is settled that permitting jurors to take notes during trial and to submit questions to be asked of witnesses lies within the sound discretion of the trial court. *State v. Hays*, 256 Kan. 48, Syl. ¶ 3, 883 P.2d 1093 (1994); *State v. Jackson*, 201 Kan. 795, 799, 443 P.2d 279 (1968), *cert. denied* 394 U.S. 908 (1969), *overruled on other grounds State v. Mims*, 220 Kan. 726, 730, 556 P.2d 389 (1976). A verdict will not be reversed for allowing jurors to take notes or ask questions absent a showing of prejudice.

Defendant's counsel objected to the trial judge's permitting jurors to take notes and submit questions. The allegation of prejudice made by defendant on this appeal is that "the jurors probably missed a lot" due to the distracting mental activities of taking notes and deciding whether to ask questions. Walker endeavors to make an error of constitutional magnitude of the trial court's decision, but there is no basis for doing so.

Examination of the record reveals no signs of prejudice. The number of questions submitted was not great. Nothing in the record suggests that the attention of the jurors was drawn away from the evidence. In fact, the questions asked by the jurors show that they were listening closely. Moreover, the questions show that the jurors' concerns were with what might have been perceived as gaps in the State's evidence. For example, T.R.M. testified that a broom handle was pushed into her vagina and police found a broom of matching description in her house. A juror submitted the question of whether the broom handle was tested for body fluid. The nurse who examined T.R.M. testified that some substance near the patient's navel fluoresced. A juror submitted the question of whether the substance was tested and, if so, what was the result.

Examination of the record also shows that the established procedures for minimizing the possibility of distractions and prejudice were heeded. The question about the broom handle was not asked because it did not pertain to the witness who was testifying when the question was submitted. We find no abuse of discretion by the district court.

Walker's final argument is that there was insufficient evidence to support defendant's conviction of criminal threat. Walker was convicted of criminal threat in violation of K.S.A. 21-3419. The statute provides: "A criminal threat is any threat to . . . [c]ommit violence communicated with intent to terrorize another." K.S.A. 21-3419(a)(1). Defendant contends that the State's evidence that he committed criminal threat is insufficient because it was unconfirmed hearsay. What he calls "unconfirmed hearsay" was the trial testimony of two police officers and the investigator for the Board of Indigent's Defense, which was offered without objection at trial. The investigator testified that T.R.M. told her that defendant said, "You're going to die, you fuckin' bitch. . . . And repeatedly referred to [her] as a fuckin' bitch and he's going to fuckin' kill her, he's going to fuckin' shoot her and that she really thought that she was going to die." One police officer testified that T.R.M. told him that she was put down on the floor on trash bags and both defendants "told her that they was going to kill her," and both defendants "threatened to kill her if she ever went to the police and told them

what had occurred at her residence that day." Another police officer testified that T.R.M. told him she "was made to lie down on plastic garbage bags and Raymond Walker had made the statement that he was just going to kill the bitch. And she at that point felt that she was going to be killed and that's why they were laying the trash bags out on the floor."

Defendant's contention, at bottom, seems to be that he cannot be convicted of criminal threat because T.R.M. did not testify at trial that he had threatened to commit violence against her with the intent to terrorize her. T.R.M.'s trial testimony, however, included the statement that as the trash bags were being laid on the floor she thought she was going to die based on statements made to her by defendant. After reviewing all the evidence, viewed in the light most favorable to the prosecution, as we must, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt of criminal threat.

The judgment of the district court is affirmed.